Samuel J. Silverman, J.
 

 This is an article 78 proceeding to invalidate the actions of respondents in relation to the “ Model Cities Program” to provide residents of Model Cities areas with preferential treatment in obtaining civil service appointments to the New York City Fire Department, Police Department, and Housing- Authority Police, to enjoin respondents from establishing the titles of Aide (M. C.), Fireman (M. C.), Patrolman (M. C.) and Housing Patrolman (M. C.), and to restrain the administration of an examination for appointment to the title of Aide (M. C.). A basic objection to these examinations and titles is that they are open only to residents of Model Cities areas in the City of New York.
 

 Petitioners sue both individually and as presidents of various organizations of policemen, firemen and Housing Authority patrolmen of the City of New York. Respondents are various city officials, including the Mayor, the Civil Service Commission, the Personnel Director of the city, the Police and Fire Commissioners, and the Chairman of the Housing Authority of the City of New York.
 

 A preliminary injunction was granted by the Appellate Division permitting the disputed examination to go forward, but staying the promulgation of any resulting list or proposed acceptable answers, or any appointments based thereon, until
 
 *278
 
 the determination of this proceeding.
 
 (Matter of Maye
 
 v.
 
 Lindsay,
 
 37 A D 2d 803 [1st Dept., Oct. 1, 1971].)
 

 Chapter 41 of title 42 of the United States Code is entitled
 
 ‘ ‘
 
 Demonstration Cities and Metropolitan Development Program ”. Subchapter I (U. S. Code, tit. 42, §§ 3301-3313), headed “ Comprehensive City Demonstration Programs ”, and the regulations promulgated thereunder, implement what is called the Model Cities Program.
 

 Section 3301 contains the Congressional findings and declaration of purpose. The findings list the plethora of ills familiar to certain parts of our American cities; slums; concentration of poor people in certain areas; lack of housing and lack of services.
 

 Under that statute, Federal moneys are made available to cities for Model Cities programs. The City of New York has applied for and presumably obtained funds to set up such a program.
 

 As part of New York City’s proposed program, the city designated three areas of the city as Model Cities areas — these being Central Brooklyn, Harlem — East Harlem, and South Bronx. Further, as part of the program, the City Civil Service, Commission has created certain civil service titles, designated as
 
 “
 
 (Model Cities) ” or “(M. C.) ”. Specifically, it has created the titles Police Aide (Model Cities), Patrolman (Model Cities), Police Trainee (Model Cities), Fire Aide (Model Cities), Fireman (Model Cities), Fire Trainee (Model Cities), Housing Police Aide (Model Cities), Patrolman N. Y. C. Housing Authority Police Department (Model Cities), Police Trainee N. Y. C. Housing Authority Police Department (Model Cities).
 

 The examination announced was for the establishment of a single list for the various Aide (M. C.) positions from which appointments would be made by either the Police Department, Fire Department, or Housing Authority. Appointments to Aide titles are to be for a period not to exceed 15 months; Aides not promoted within the 15 months will be terminated. After six months, Aides will be eligible to compete in a promotion examination for the respective positions of Patrolman (Model Cities), or, if under 21 years of age, Police Trainee (Model Cities); Fireman (Model Cities) or Fire Trainee (Model Cities); Patrolman New York City Housing Authority Police Department (Model Cities) or Police Trainee New York City Housing Authority Police Department (Model Cities). A Trainee, upon attaining the age of 21, will mature to the Patrolman, Fireman or Patrolman New York City Housing Authority
 
 *279
 
 Police Department (Model Cities) titles. From the positions of Patrolman (Model Cities), Fireman (Model Cities) or Patrolman New York City Housing Authority Police Department (Model Cities) candidates will he eligible to compete in promotion examinations for regular higher ranks in the Police Department, Fire Department and New York City Housing Authority police service, i.e., presumably sergeant or higher.
 

 The duties of a Police Aide (Model Cities) are stated to be: “Under close supervision of the Police Department, working in a Model Cities area, assists and works mainly in programs designed to develop closer understanding and cooperation between the community and the Police Department; assists departmental personnel assigned to Model Cities areas in the attainment of Department objectives The duties of the other Aides are similar.
 

 The salaries of Aides will he $5,750 per year; the salaries of Patrolman (M. C.), Fireman (M. C.) and Patrolman New York City Housing Authority Police Department (M. C.) will apparently he the same as the salaries of the regular Patrolman, Fireman and Patrolman New York City Housing Authority Police Department, not (M. C.).
 

 The commission has stated that the examination for Aide (M. C.) will be “ less difficult than the regular entrance examination for Patrolman or Fireman”, but that the promotion examination to the uniformed titles will be an “ equivalent examination” which will be “equivalent to the regular open competitive examination for Patrolman, Fireman or Patrolman iTYOjrAPD. In addition the test will be designed to measure those special traits and understanding which enhance their capability to function effectively in the Model Cities areas ”.
 

 The commission ordered an open competitive examination for the title of Aide (M. C.). It published the following residence requirement: “Applicants must be residents of a Model Cities area at the time of filing and must continue to reside in the Model Cities area during the period of employment in a Model Cities title ’
 

 Petitioners attack the validity of the proposed examination on the ground that the commission has no authority to establish this residence requirement; that the examination, and particularly the residence requirement, is a violation of the constitutional requirement of appointments on the basis of merit and fitness; that the plan involves racial discrimination (what has been called “ reverse discrimination ”). Respondents dispute each of these contentions, and further contend that the
 
 *280
 
 requirements are valid under the Supremacy Clause of the United States Constitution.
 

 A.
 
 Requirement of Compliance with State Statutes
 

 Respondents argue that they are excused from compliance with otherwise controlling State statutes because of the Supremacy Clause of the Federal Constitution, and because of provisions of the applicable State statutes. I cannot accept either argument.
 

 1. The Supremacy Clause of the United States Constitution (art. VI) provides in substance that the Constitution and the laws of the United States shall be the supreme law of the land. As it relates to Federal statutes this provision results in overriding State statutes only when the Congress intends to override State statutes. Here, the Congress explicitly stated that it did not intend to override State statutes. Thus, section 3303 (subd. [a], par. [4]) of title 42 of the United States Code specifically provides that a comprehensive city demonstration program (i.e., a Model Cities program) is eligible for assistance under the act only if “ substantive local laws, regulations, and other requirements are, or can be expected to be, consistent with the objectives of the program.”
 

 This requirement has been recognized in a bulletin issued by the United States Department of Housing and Urban Development in December 1967, which provides (p. 24): “If local or State laws and regulations present obstacles to achieving program goals, appropriate modifications should be sought.”
 

 I conclude that the Congress did not intend to override State legislation.
 

 2. The authorizing State legislation does not excuse compliance with other State laws. Section 99-h of the General Municipal Law which authorizes municipalities to participate in Federal programs, such as the Model Cities program, provides that any municipal corporation shall have power to accept funds made available by the Federal Government ‘ ‘ pursuant to the provisions of any federal law, which is not inconsistent with the statutes or constitution of this state ” (subd. 2). And subdivision 4 of that section provides that “it is not intended by this section to repeal by implication any existing provision of law.”
 

 Accordingly, the city’s program to be valid must comply with applicable State statutes.
 

 B.
 
 Lack of Compliance with State Statutes
 

 3. Petitioners contend that the residence requirement is a violation of sections 3 and 30 of the Public Officers Law. Sec
 
 *281
 
 tion 3 of the Public Officers Law is entitled ‘1 Qualifications for holding office ” and in general provides that
 
 “
 
 No person shall be capable of holding a civil office who shall not, at the time he shall he chosen thereto * * * be * * * a resident of the state, and if it be a local office, a resident of the political subdivision or municipal corporation of the state for which he shall be chosen * * * or within which his official functions are required to be exercised”. The statute then goes on to make a number of exceptions to this requirement, of which the most significant for our purposes are subdivisions 2, 4 and 9. They provide in part as follows:
 

 “
 
 2. Neither the provisions of this section nor of any general, special or local law, charter, code, ordinance, resolution, rule or regulation, requiring a person to be a resident of the political subdivision or municipal corporation of the state for which he shall be chosen or within which his official functions are required to be exercised, shall apply to the appointment of a person as a member of the police force of any political subdivision or municipal corporation of the state if such person resides (a) in the county in which such political subdivision or municipal corporation is located; or
 
 “
 
 [various other counties within the city or state, essentially any county contiguous to the city or a county contiguous to a county within the city or less than 30 miles from the city]. * * *
 

 “ 4. Except as otherwise provided in subdivision nine of this section, persons heretofore or hereafter employed in the paid fire department of a city, town, village or fire district shall not be deemed to be holding a civil office or a local office within the meaning of this section and the provisions of this section shall not apply to such persons. The provisions of any general, special or local law, city or village charter, code or ordinance, or any rule or regulation requiring a person to be a resident of the political subdivision or municipal corporation of the state for which he shall be chosen or within which his official functions are required to be exercised shall not apply to the appointment or continuance in office of any such person so employed, if such person resides in the county, or one of the counties, in which such political subdivision or municipal corporation is located.
 
 * * *
 

 “ 9.
 
 Neither the provisions of this section, nor of any general, special or local law, charter, code, ordinance, resolution, rule or regulation, requiring a person to be a resident of the political subdivision or municipal corporation of the state for which he shall be chosen or within which his official functions
 
 *282
 
 are required to be exercised, shall apply to the appointment of a paid member of the uniformed force of a paid fire department * # * of any city of over one million population who resides (a) in the county in which such city is located; or (b) in a county within the state contiguous to the county in which said city is located; or (c) in a county within the state contiguous to such city; or (d) in a county within the state which is not more than fifteen miles from said city.”
 

 ■Section 30 of the Public Officers Law entitled
 
 “
 
 Creation of vacancies ’ ’ provides that: ‘ ‘ Every office shall be vacant upon the happening of one of the following events * * * d. His ceasing to be an inhabitant of the state, or if he be a local officer, or the political subdivision, or municipal corporation of which ■he is required to be a resident when chosen ’ ’. Again there are various exceptions of which the most important for our purposes are subdivisions 4 and 5 reading in part as follows: “ 4. Neither the provisions of this section, nor of any general, special or local law, charter, code, ordinance, resolution, rule or regulation, creating a vacancy in a local office of a political subdivision or municipal corporation if the incumbent thereof ceases to be a resident of such political subdivision or municipal corporation, shall apply in the case of a person who is a member of the police force of any political subdivision or municipal corporation of the state and who while a member of such force resides (a) in the county in which such political subdivision or municipal corporation is located; or ” [various other counties somewhat analogous to the provision of subdivision 2 of section 3]. * * *
 

 “
 
 5. Neither the provisions of this section, nor of any general, special or local law, charter, code, ordinance, resolution, rule or regulation, creating a vacancy in a local office of a political subdivision or municipal corporation if the incumbent thereof ceases to be a resident of such political subdivision or municipal corporation, shall apply in the case of a paid member of the uniformed force of a paid fire department * * * who resides (a) in the county in which said city is located; or” [various other counties somewhat analogous to the provision of subdivision 2 of section 3].
 

 Respondents argue that these statutes merely create an exception to the residence requirement of sections 3 and 30 of the Public Officers Law and do not forbid the imposition by the Civil Service Commission of residence requirements; that these exceptions are merely intended essentially to remove police and fire officer from the definition of public officers for this purpose.
 
 *283
 
 I cannot accept this argument. The fair meaning of these statutes is to permit police and fire officers to live in the specified areas outside the political subdivision in which they are to perform their functions. Subdivisions 2 and 9 of section 3 of the Public Officers Law and subdivisions 4 and 5 of section 30 create exemptions not only from the Public Officers Law requirement of residence applicable to public “ officers ” but also from
 
 “
 
 any general, special or local law, charter, code, ordinance, resolution, rule or regulation requiring a person to be a resident of the political subdivision or municipal corporation ” etc. Indeed the first sentence of subdivision 4 of section 3 read with subdivision 9 seems to be an almost explicit rejection of the contention that the statute merely means that fire officers of the City of New York are not public officers.
 

 Again, subdivision 4-b of section 23 of the Civil Service Law is a rather persuasive indication that the Legislature did not intend to allow civil service commissions to impose residence requirements for police and fire officers in the City of New York. Section 23 by its terms does not apply to the City of New York (subd. 5) but in authorizing other cities to require residence in a geographically defined area which is a portion of such city, for positions in that area where required in order to qualify for Federal moneys, there is an express exception for
 
 1 ‘
 
 those eligibles on policemen and firemen lists ”.
 

 I think the provisions of subdivisions 2 and 9 of section 3 of the Public Officers Law, and subdivisions 4 and 5 of section 30 of the Public Officers Law do not apply literally to the position of Aide (M. C.). Thus, subdivision 2 of section 3 and subdivision 4 of section 30 refer to “ a member of the police force subdivision 9 of section 3 and subdivision 5 of section 30 refer to “a paid member of the uniformed force of a paid fire department”.
 

 An Aide (M. C.) is not, I think, either a member of the police force or a paid member of the uniformed force of a paid fire department. But the position of Aide (M. C.) is merely a preparatory position. The whole point of the creation of the position of Aide (M. C.) is eligibility for promotion to Patrolman (M. C.) or Fireman (M. C.) or Patrolman New York City Housing Authority, Police Department (M. C.), and indeed, further eligibility for promotion to the higher ranks of the uniformed police and fire departments. (I think a Patrolman of the New York City Housing Authority Police Department is
 
 “a
 
 member of the police force of any * * * municipal corporation of the state ” within the meaning of sections 3 and
 
 *284
 
 30 of the Public Officers Law. Cf. Public Housing Law, §§ 401, 402, subd. 5.) Unless the promotion takes place within 15 months, the position of Aide (M. C.) is terminated.
 

 If, as I think, the requirement of residence within the Model Cities area invalidates provisions for promotion to the various Patrolman (M. C.) and Fireman (M. C.) positions, then the whole plan for Model Cities positions in the city civil service limited to residents within the Model Cites area fails.
 

 I express no opinion as to the power of the heads of the various departments to assign to duties within the various Model Cities areas any regularly appointed patrolmen and firemen who may reside in those areas.
 

 4. Quite apart from the special provisions of sections 3 and 30 of the Public Officers Law forbidding residence requirements for policemen and firemen more restrictive than those set forth in the statutes, I think the requirement of residence within the Model Cities area in the circumstances of this case violates the constitutional and statutory civil service requirements for appointments based on merit and fitness to be determined by competitive examinations, as far as practicable.
 

 The basic civil service requirement is contained in section 6 of article V of the State Constitution, reading in part as follows: “Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall bo competitive; ” (with exceptions not here relevant).
 

 5. Eespondents suggest that the residence requirement is somehow related to the desirability that the appointee shall have a special sensitivity to, understanding of, and experience with problems of the Model Cities areas. Petitioners contend that the residence requirement is merely a means of assuring that jobs shall go to a particular group — residents of the Model Cities areas.
 

 I cannot accept the argument that the residence requirement can be justified on merit and fitness grounds because of the special sensitivity, understanding and experience required. I do not think it can rationally be contended that a person who has lived in the area all his life and moved to an adjoining area the day before the test, is less sensitive to, understanding of, or experienced with the problems of the area than a person who has never lived in the area, but moved in the day before
 
 *285
 
 the test; yet the latter is qualified to take the test and the former is not.
 

 If, as respondents contend, these qualities of special sensitivity, understanding and experience can be objectively tested for, then they should be; and respondents say they will be. But to require residence within the Model Cities areas at the time of examination is not, I think, objectively related to those qualities. Rather, it is a means of affording employment to residents of the areas in preference — perhaps justifiable preference— to nonresidents of the areas. Indeed, that is one of the objectives of the Model Cities programs. The Corporation Counsel explicitly states that “ The program here under attack was necessary in order to ‘ [provide] maximum opportunities for employing residents of the areas in all phases of the program. ’ ”
 

 Respondents rely heavilv on
 
 Matter of Council of Supervisory Assns.
 
 v.
 
 Board of Educ. of City of N. Y.
 
 (23 N Y 2d 458 [1969]). In that case the Court of Appeals held that the Board of Education of the City of New York could make temporary appointments to the position of principal of demonstration schools, not from the regular existing school principals’ list, on the ground that the position of principal of the demonstration elementary schools required qualifications different from those for the regular principals’ job, including among other things, experience with the race problems in relation to education and experience with community relations. The court explicitly made the distinction that it was the difference in the job that made the existing list inapplicable and that these additional requirements would have to be tested for by “ specific and objective criteria of experience in the area of community-education programs.” (p. 468). The Court of Appeals said (p. 469): “ This decision * * * is limited to a well-recognized power to create new positions for new needs and to fill them temporarily until lists based on examinations can be promulgated. The court will not permit such a procedure to be used as a device for evasion of the civil service requirements ”.
 

 Thus the various civil service commissions of the State have power to define jobs and to state and test for the requirements for the jobs. But they cannot decide that what they wish to do is to give employment to particular persons or particular groups, and fit the requirements for the jobs to those groups. Here it is quite plain — it is indeed one of the express objectives of the program — that it is desired to give employment to residents of the Model Cities area-and therefore the examina
 
 *286
 
 tions are limited to such residents. This may be a very desirable thing to do. But I think it runs counter to the basic State constitutional requirement that ‘ ‘ appointments and promotions in the civil service * * * shall be made according to merit and fitness.”
 

 6. Petitioners argue that the residence requirement involves reverse racial discrimination because the residents of the Model Cities area are largely Black or Spanish-speaking. The Court of Appeals in the
 
 Council of Supervisory Assns.
 
 case
 
 (supra)
 
 said: “ The position could not lawfully be filled on the basis of race” (p. 467). “ Race or religion cannot, as qualifying factors, constitutionally be considered but experience can be considered ” (p. 468).
 

 There are some statements by the Administrator of the Model Cities Policy Administration of the city which seem to lend some support to petitioners’ contention, e.g., in a letter dated September 21, 1971, to the Assistant National Administrator, the City Administrator, Mr. Williams, states: ‘ ‘ Rigid Civil Service requirements have been the major impediment to increasing the number of Blacks and Puerto Ricans in the Police and Fire Departments. Thus, we believe our proposal is consistent with the intent of the Model Cities enabling legislation since it represents an important step in modifying those unfair requirements.”
 

 If the civil service requirements are unfair they should of course be corrected by appropriate changes in the examinations. But I do not think this justifies imposing residence requirements. Perhaps it is enough as to this aspect of the case to again quote the Court of Appeals in the
 
 Council of Supervisory Assns.
 
 case (p. 467):
 
 “
 
 The fact some proponents of experimental changes argued this would mean selection only from members of the ethnic groups themselves, as this record suggests, is not decisive. Nor is this viewpoint controlling on the board. This is not the basis on which the new position was described and promulgated in the official records of the board.”
 

 7. This is not the first time that an effort has been made by civil service commissions to. limit appointment to residents of particular areas less than the political subdivision in which they are appointed, and to do so without statutory authority. Such efforts have uniformly been declared invalid on the ground that the only residence requirement that can be imposed without express statutory authority is a residence requirement not more restrictive than a recognized political subdivision of the State. So it was held in
 
 People ex rel. Melledy
 
 v.
 
 Shea
 
 (73 App. Div.
 
 *287
 
 232, 235-236 [1st Dept., 1902]) where the court said: “It is not difficult to see that if the commission had power to subdivide a given locality into as many districts as it saw fit, and then by rules of its own adoption make an applicant ineligible to appointment to a position except in the district in which he resided at the time the application was made, how the object sought to be accomplished by the statute would be entirely defeated and the statute, in effect, repealed.”
 

 Indeed, where appointment is to a city-wide department, a requirement (without statutory authority) of residence within a particular borough for jobs within that borough is invalid.
 
 (People ex rel. Franklin
 
 v.
 
 Fetherston,
 
 168 App. Div. 416 [2d Dept., 1915].)
 

 8. For the reasons stated, I think that in the circumstances of this case the requirement of residence is invalid.
 

 Of course, even the constitutional requirement of merit and fitness (much less the statutory restriction on residence requirements) was not handed down on Mount Sinai. There is room for systems of values in which other considerations may even outweigh the constitutional requirement of appointments based on merit and fitness. (Indeed, the constitutional exception “ as far as practicable ” is to some extent a recognition of this fact; but “practicable” is not a synonym for “advisable”.) Whether some other ends and values outweigh the requirement of merit and fitness or the statutory restriction on residence requirements is a question of policy to be determined by those to whom such decisions are confided — the people of the. State, the Legislature, and perhaps the Congress — and the State Constitution and the applicable statutes are the definitive and binding expression of those policy determinations. The present statutes of this State I think forbid the residence requirement sought, to be imposed.
 

 Accordingly, the petition is granted to the extent of invalidating the examinations for Aide (Model Cities) and the requirement in connection therewith of residence in the Model Cities areas.