CHARLES BRENNAN et al., Respondents-Appellants, v NEW YORK CITY HOUSING AUTHORITY et al., Appellants-Respondents.

First Department, February 7, 1980

## APPEARANCES OF COUNSEL

*Raphael Samuel* of counsel *(Donald Schatz,* attorney), for appellants-respondents.

*Murray A. Gordon* of counsel *(Henry T. Berger* and *Kenneth E. Gordon* with him on the brief; *Gordon & Schectman, P. C.,* attorneys), for respondents-appellants.

**OPINION OF THE COURT**

Ross, J.

We are called upon to determine whether these 36 plaintiffs, all Housing Authority Police Officers of the New York City Housing Authority, are required to vacate their present out-of-State residences and relocate within approved geographical areas of this State. Underlying this analysis is the elusive question of whether the defendant, a subdivision of the municipal corporation may be equitably estopped from enforcing this mandate. Under the circumstances presented herein, and in the interests of justice, the governmental unit should be estopped.

The operative facts are not in dispute. The plaintiffs, averaging more than 14 years of service on the Housing Authority's police force, were appointed during the years 1953-1973. At the time of their individual appointments, each was a resident of New York State. The mandatory examination taken prior to appointment left unspecified a residence requirement. However, civil service examinations given at the same time for other peace officer positions specified residence in certain areas within New York State. Additionally, in a combined examination for Housing Authority Patrolman, New York City Transit Authority Patrolman and Correction Officer, given on November 22, 1969, a specified in-State residence was required for the latter two titles but not the first. Promotional examinations were to the same effect. Thereafter each purchased a home in the neighboring States of New Jersey and Connecticut and have lived in these locales for an average of seven years. Parenthetically, several plaintiffs have resided out of State for over 15 years. Most, if not all, moved only after receiving assurances from superior officers that their then contemplated move was lawful.

Prior to moving, these officers were aided by defendant in securing mortgages on their property. After their moves, defendant rendered further aid by securing New York State driver's licenses and domiciliary pistol permits for plaintiffs.

On December 7, 1978, the Housing Authority Police Chief issued Memorandum No. 58, requiring all plaintiffs pursuant to section 30 of the Public Officers Law, to be residents of New York State and to reside within certain designated counties. The plaintiffs had until December 15, 1979, to comply therewith or face dismissal.

Plaintiffs then commenced these proceedings which are

amply elucidated in the dissenting opinion. As noted by my dissenting brothers, Special Term correctly found, and I agree, that Housing Authority Police Officers are public officers within the meaning of the statute *(Matter of Maye v Lindsay, 69 Misc 2d 276, revd 41 AD2d 127, reinstated on opn of Special Term 33 NY2d 552)*. However, as to these plaintiffs, the residency requirement should not be enforced.

Traditionally, courts and other adjudicatory tribunals have determined that equitable estoppel is not applicable to the government or its subdivisions. No doubt this rule found its genesis in that larger body of law of sovereign immunity (2 Davis, Administrative Law Treatise, § 17.01 *et seq.)*. However, in recent times the judiciary has retreated from this rigid standard and currently employs a flexible medium in examining the specific facts of each case.

One court which has played a leading role in the liberalizing of the doctrine of equitable estoppel suggests that courts balance the harm suffered by a party who has relied on governmental action against the damage to the public interest *(United States v Lazy FC Ranch,* 481 F2d 985). This same court will only apply, and rightly so, equitable estoppel against the government if certain conditions are initially satisfied: "[t]he party to be estopped must know the facts * * * he must intend that his conduct shall be acted on * * * the [other party] must be ignorant of the true facts; and * * * he must rely on the former's conduct to his injury" *(United States v Georgia-Pacific Co.,* 421 F2d 92, 96).

While I am not prepared to categorically sanction the "balancing of interests" test, it can safely be said that equitable estoppel is applicable to all units of local government in exceptional cases to promote the ends of justice, where judicial intervention will far outweigh the manifest injustice that has occurred or will occur *(Eden v Board of Trustees of State Univ. of N. Y.,* 49 AD2d 277; see, also, 2 Antieau, Municipal Corporation Law, § 16A.00 *et seq.)*.

Any analysis of the problem presented herein must commence with a surmounting of the above-mentioned threshold criteria. Stated in an alternate fashion: "where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or

defense which it otherwise could have raised." *(Bender v New York City Health & Hosps. Corp.,* 38 NY2d 662, 668.)

Applying the above, it is evident that defendant Housing Authority knew the residential status of their employees, and the law applicable to them. The open publication of examinations for entry level and promotional positions without a residence requirement, coupled with the affirmative aid given by defendant prior and subsequent to the out-of-State relocations rendered foreseeable plaintiffs' reliance thereon. The dissent seems to argue that these plaintiffs are deemed to know the law. However, where there has been an authoritative interpretation of the law by a duly authorized officer, as here by the Director of Personnel of the City of New York; a mistake of law should estop the government. (21 U of Chi L Rev 680, 691.) Moreover, it has also been argued that, where the government fails to speak when there is a duty, the government will be estopped (79 Col L Rev 551, 559). Clearly, the duty to enlighten was ever present as to these plaintiffs. I believe the dissents' reliance on *Matter of Gavigan v McCoy* (37 NY2d 548, 552) and *Matter of Albert Simon, Inc. v Myerson* (36 NY2d 300, 303) is misguided. In *Simon,* the opinion does not suggest that there was reasonable reliance upon the governmental agency finding that pinball games are not gaming devices. In *Gavigan,* it was not claimed that the petitioner reasonably relied upon his out-of-title assignment as lawful.

It is important to note defendants acknowledge that they do not subscribe to "the simplistic and obsolescent doctrine that estoppel may never lie against public agencies."

Defendants argue that for over 20 years the Housing Police have been seeking equality with other police forces of the City of New York. To this end the General Counsel of the Housing Authority issued an opinion dated April 22, 1977, reasoning that Housing Authority Police Officers were public officers required to live within New York State. Yet subsequent thereto, three promotional examinations conducted on August 31, September 24, 1977, and March 30, 1978, failed to specify a residence requirement when such was clarified less than one year before.

Equitable estoppel is a vital doctrine now more actively invoked than in years past. Courts throughout this State have applied this doctrine under any number of circumstances. (See for example *Bender v New York City Health & Hosps. Corp.,*

*supra;* the doctrine applies to notice of claim; *Eden v Board of Trustees of State Univ. of N. Y.,* 49 AD2d 277, *supra;* the State has been estopped from asserting claimed lack of capacity to contract with petitioners; *Matter of Moritz v Board of Educ.,* 60 AD2d 161; the board of education has been estopped from denying that teacher is tenured; *Matter of 1555 Boston Rd. Corp. v Finance Administrator of City of N. Y.,* 61 AD2d 187; the City was estopped in area of taxation where manifest injustice is present; also, see, 21 NY Jur, Estoppel § 76.)

"It is the principle of estoppel that brings flexibility and justice to the law of municipal corporations" (2 Antieau, Municipal Corporation Law, § 16A.00). Presently the imposition of equitable estoppel will not work a serious injustice nor unduly damage public policy. Its application to these 36 plaintiffs is limited and will prevent a "manifest injustice".

I can conceive of no more important function of our courts, than shielding our citizens from an overbearing (or as here, a negligent) governmental agency.

Accordingly, the order, Supreme Court, New York County (ASCH, J.), entered on July 3, 1979, granting plaintiffs' application for a preliminary injunction, and denying the plaintiffs' cross motion for summary judgment as premature, should be modified, on the law, to the extent of declaring that Police Officers of the Housing Authority of the City of New York are public officers within the meaning of section 30 of the Public Officers Law and subject to the residency requirements therein, but defendants are equitably estopped from imposing these requirements on plaintiffs, and, as so modified, the order should be affirmed, without costs.

BIRNS, J. (concurring). I would concur with the Presiding Justice and Justice Ross in similarly modifying the judgment below but not for the reasons expressed by them. The issuance of a preliminary injunction in this case should not rest upon the answer to the question whether the New York City Housing Authority is or is not estopped from enforcing the residency requirements found in the Public Officers Law.

The pivotal issue on this appeal is whether plaintiffs, as New York City Housing Authority Police Officers, are employees of a "political subdivision" or "municipal corporation" so as to be subject to the residency requirements of subdivision 1 of section 3 and section 30 (subd 1, par d) of the Public Officers Law.

I am of the view that those sections are inapplicable to police officers employed by the New York City Housing Authority because that authority is a legislatively created "public housing authority", rather than a "political subdivision" or "municipal corporation".

The New York City Housing Authority when first created (L 1934, ch 4) was intended to be separate and independent of any other governmental body (Foley, Jr., Low-Rent Housing and State Financing, 85 U of Pa L Rev 239, 253). It was originally governed by the Municipal Housing Authorities Law and subsequently placed under the Public Housing Law.

The character of public housing authorities was discussed in *Ciulla v State of New York* (191 Misc 528, 531, 536) where the court stated that "[r]eference to specific provisions of the Public Housing Law reveals a consistent, deliberate scheme to maintain intact the underlying concept of housing authorities as independent corporations," and that "taking the Public Housing Law as a whole, reading it within the framework of the entire concept of the nature of public authorities as indicated by many considerations already discussed, the intent of the Legislature seems abundantly clear—housing authorities are separate, legally independent public corporations; they are the agents of neither the State nor its municipalities."

The Court of Appeals, in *Matter of New York Post Corp. v Moses* (10 NY2d 199, 203), confirmed this view, declaring: " '[A] public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function.' *Matter of Plumbing Assn. v. Thruway Auth.,* 5 NY2d 420, 424.)"

Counsel for the New York City Housing Authority "readily and willingly concede[s] * * * that the New York City Housing Authority is neither a municipal corporation nor a political subdivision of the State of New York, but rather, a 'public corporation which is a corporate governmental agency'."

Because of this crystalized concept of the Housing Authority as neither a political subdivision of the State nor a municipal corporation, I am unable to accept the primary thesis of Justices FEIN and LUPIANO that our decision in this case is compelled by *Matter of Maye v Lindsay* (69 Misc 2d 276, revd 41 AD2d 127, reinstated 33 NY2d 552 on opn of Special Term).

The holding in that case was that the statutory adoption of

a Model Cities program by the United States Congress did not impinge upon the power of the State to establish residency requirements for members of the police and fire departments. I recognize, of course, that representatives of the New York City Housing Authority Police Officers Benevolent Association joined in the successful challenge against preferential treatment for residents of Model Cities areas who sought employment as police officers or firemen. However, the specific issue which now confronts us was not raised in *Matter of Maye (supra)* nor in any court either at Special Term or on the appellate level. The comment in *Matter of Maye (supra)* by the Justice at Special Term that patrolmen of the New York City Housing Authority are members of the police force of a municipal corporation of the State within the meaning of sections 3 and 30 of the Public Officers Law was dictum. That statement was neither necessary nor essential to the court's determination, and in my view, is not *stare decisis.* Consider Justice SILVERMAN's statement in that case (at pp 283-284): "(I think a Patrolman of the New York City Housing Authority Police Department is 'a member of the police force of any * * * municipal corporation of the state' within the meaning of sections 3 and 30 of the Public Officers Law. Cf. Public Housing Law, §§ 401, 402, subd. 5.)" It is apparent that Justice SILVERMAN's observation, expressed parenthetically, was no more than a passing comment "uttered by the way, not upon the point or question pending" *(Rohrbach v Germania Fire Ins. Co.,* 62 NY 47, 58) and obviously not intended to be the holding in *Maye.*

I find that the New York City Housing Authority Police Officers are not employees of a "political subdivision" or "municipal corporation" and thus are not subject to the residency requirements found in the Public Officers Law (§ 3, subd 1; § 30, subd 1, par d). Accordingly, Memorandum No. 58 issued by the Housing Authority Police Chief assertedly to enforce the residency provisions of the Public Officers Law so as to require all members of the New York City Housing Authority Police Department to be residents of New York State and reside within certain designated counties of that State is without legal effect.

The judgment of the Supreme Court, New York County (ASCH, J.), entered July 3, 1979, *inter alia,* granting a preliminary injunction restraining the implementation or enforcement of that memorandum should be affirmed.

LUPIANO, J. (dissenting). Plaintiffs are 36 Police Officers of the Housing Authority Police Department of the New York City Housing Authority who seek a declaratory judgment that the provisions of the New York Public Officers Law which require public officers to be residents of New York State are inapplicable to Housing Authority Police Officers, and that memoranda issued by the Chief of the Housing Authority Police Department in enforcement of this residency requirement are unconstitutional and unlawful. An injunction, permanently and *pendente lite* is also sought against enforcement of the said memoranda.[1] Upon plaintiffs moving for an injunction *pendente lite* staying the defendants from implementing or enforcing the residency requirements imposed by Memorandum No. 58, dated December 7, 1978, issued by New York City Housing Authority Police Department Chief Benjamin Ward, the defendants moved for judgment dismissing the complaint pursuant to CPLR 3211 (subd [a], par 7) for failure to state a cause of action. Plaintiffs cross-moved for an order pursuant to CPLR 3211 (subd [c]) granting them summary judgment against the defendants. CPLR 3211 (subd [c]) provides, in pertinent part: "Whether or not issue has been joined, the court, after adequate notice to the parties, may treat the motion as a motion for summary judgment." Special Term elected not to treat the plaintiffs' motion for an injunction *pendente lite* and the defendants' motion to dismiss as involving summary judgment relief. Specifically, Special Term noted: "Plaintiffs' cross-motion for summary judgment is denied as premature, without prejudice to renewal upon joinder of issue."

Special Term found, and we agree, that Housing Authority Police Officers (such as plaintiffs) are subject to the residency requirements of the Public Officers Law.[2] (See *Matter of Maye v Lindsay,* 69 Misc 2d 276, revd 41 AD2d 127, reinstated on opn of Special Term 33 NY2d 552.)

Justice BIRNS' concurrence in the majority is solely based on the conclusion that no constraint is imposed by *Matter of Maye v Lindsay (supra).* Such conclusion is unwarranted. That case clearly involved an article 78 proceeding to invalidate the actions of respondents therein, in relation to the "Model Cities

---

1. The "Wherefore" clause of the complaint seeks an order and judgment, *inter alia:* "(i) declaring and adjudging the memoranda to be unconstitutional, invalid, null and void, and of no force or effect; (ii) declaring and adjudging that the defendants are estopped and barred from asserting, implementing or enforcing the memoranda".

2. Public Officers Law, §§ 3, 30.

Program," to provide residents of Model Cities areas with preferential treatment in obtaining civil service appointment to, *inter alia,* the Housing Authority Police. Among the petitioners was the President of the Housing Authority Patrolmen of the City of New York in his individual and representative capacity. Said petitioners contended that the residence requirement published in connection with the open competitive examination for the title of Aide (M.C.) limiting the applications to residents of Model Cities areas ran afoul of the residence requirements of sections 3 and 30 of the Public Officers Law. Relevant to petitioner Housing Authority Patrolmen, it was argued that after six months the Aide (M.C.) would be eligible to compete in a promotion examination for the position of Patrolman, New York City Housing Authority Police Department (Model Cities) or Police Trainee New York City Housing Authority Police Department (Model Cities). From the position of Patrolman New York City Housing Authority Police Department (Model Cities) an individual would be eligible to compete in promotional examinations for regular higher ranks in the New York City Housing Authority police service. Section 3 of the Public Officers Law, entitled "[q]ualifications for holding office" states, in pertinent part, that "[n]o person shall be capable of holding a civil office who shall not * * * be a * * * resident of the state, and if it be a local office, a resident of the political subdivision or municipal corporation of the state for which he shall be chosen * * * *or* within which his official functions are required to be exercised". (Emphasis supplied.)

Thus, a distinction is made as to the location of the office in a political subdivision or municipal corporation of the State and as to the location of the exercise of required official functions in a political subdivision or municipal corporation of the State. As the court (SILVERMAN, J.) perspicaciously noted, "[t]he whole point of the creation of the position of Aide (M.C.) is eligibility for promotion to * * * Patrolman New York City Housing Authority, Police Department (M.C.), and indeed, further eligibility for promotion to the higher ranks" *(Matter of Maye v Lindsay, supra,* at p 283).

Concluding that the office of Patrolman of the New York City Housing Authority Police Department is within the ambit of sections 3 and 30 of the Public Officers Law, Special Term found the residence requirements for Model Cities positions in the city civil service to be in noncompliance with other State

statutes, i.e., violative of "the special provisions of sections 3 and 30 of the Public Officers Law forbidding residence requirements for policemen * * * more restrictive than those set forth in the statutes" (at p 284). The Court of Appeals did not merely adopt the result of Special Term's rationale, it adopted that rationale by reinstating that result "on the opinion at Special Term" (33 NY2d 552, 553).

The holding in *Matter of Maye v Lindsay (supra)* was not limited merely to the characterization that the adoption of a Model Cities program by Congress did not override State legislation; it held, also, that the residence requirement of the Model Cities program developed by New York City violated the residence requirements of the Public Officers Law forbidding residence requirements for, *inter alia,* Housing Authority Patrolmen, more restrictive than those set forth in the statute. Absent rejection of this aspect of Special Term's holding in *Maye* by the Court of Appeals and in light of the adoption of such holding by that court, settled principles of *stare decisis* mandate recognition of the constraint imposed by the Court of Appeals determination. Thus, the finding by Special Term in *Maye* that Housing Authority Police Officers are subject to the Public Officers Law is not obiter dictum, but is essential to one of the key twin predicates for the result reached, i.e., to the conclusion that the Model Cities residency requirements respecting Housing Authority Police violated the Public Officers Law and was, therefore, invalid. Obviously, if the Public Officers Law did not apply to Housing Authority Police, the Model Cities residency requirements would not be violative of that State statute regarding such police and this distinction would have to be noted. To reiterate, not only did the Court of Appeals refuse to make this distinction, it adopted the reasoning of Special Term.

However, this does not end the inquiry, because subsumed within the issue of whether the residency requirements of the Public Officers Law encompass Housing Authority Police is the issue of whether the residency requirement should be enforced against these plaintiffs.

On December 16, 1952, when the authority established a Housing Police Force, the members of that force were deemed to be only special patrolmen whose police functions were strictly limited to authority property. Since that time, a series of legislative enactments has resulted in substantial conformity of the status, duties and responsibilities of Housing Police

Officers with those of other police officers within the State of New York. Plaintiffs were at the times of their respective appointments to the Housing Police Force, residents of the State of New York. Thereafter, each of them established residence outside of New York State in either of the neighboring States of New Jersey or Connecticut. Plaintiffs point out that the notices of examination for the examination each underwent to obtain the position of Housing Police Officer did not set forth residency requirements, while notices of examination for the Transit Police and in the Correction Department did specify the Public Officers Law residency requirements. Further, plaintiffs assert that prior to December 7, 1978, they were informed by members of the Housing Authority Police Department that they were not required to live within the State of New York, which information preceded relocation by plaintiffs to New Jersey and Connecticut for residence purposes. It appears that most, if not all, of the plaintiffs obtained private homes out of State in reliance on this information and with the active co-operation of the Housing Authority and its Police Department. Personal data questionnaires were filed by plaintiffs on an annual basis and, when appropriate, a change of address form was also filed. It is asserted that defendants actively aided several of the plaintiffs in obtaining mortgages on the out-of-State residences and in other incidental matters, such as the obtaining of pistol permits from these sister States and the obtaining of New York driver's licenses as out-of-State residents. Many of the plaintiffs were promoted after acquiring their out-of-State residences with those responsible for implementing the promotion having knowledge of such residences.[3]

According to plaintiffs, it was the issuance of Memorandum No. 58, dated December 7, 1978, by Housing Police Chief Benjamin Ward which, for the first time, imposed on them strict compliance with the residency requirement as a condition of their continued employment.

It is noted that section 3 of the Public Officers Law speaks of residency in the State in terms of qualification for holding

---

3. Special Term's decision noted that "Their [plaintiffs'] out-of-state residency has been overt rather than covert or clandestine. It is undisputed that the defendants have had actual, or at least constructive knowledge of plaintiffs' out-of-state residency. Plaintiffs' moving papers are replete with exhibits such as official letters addressed to them documenting defendants' knowledge of plaintiffs' out-of-state residency."

civil office, while section 30 (subd 1, par d) specifically dictates that a vacancy in the office is created upon the incumbent's "ceasing to be an inhabitant of the state."

"Although the courts have recognized certain exceptions to the general rule that estoppel does not operate against the state and have taken the position that under some circumstances some varieties of estoppel may operate even against the state, the state cannot be estopped on any equitable grounds from exercising its sovereign powers; estoppel is not applicable to the state acting in a governmental capacity. The state in the exercise of its sovereign powers is not to be obstructed by the failure of its appointed agents or officers to obey its commands or by their unauthorized acts or omissions. An estoppel may not be invoked against public officials performing their legal duty" (21 NY Jur, Estoppel, § 76).

"A city, county, town or other governmental body or agency of the state, may be estopped the same as an individual, where it is acting in a corporate or proprietary capacity, but it cannot be estopped to assert its governmental power as to acts within its governmental capacity as an agency of the state" (21 NY Jur, Estoppel, § 78).

As aptly noted in *Matter of Gavigan v McCoy* (37 NY2d 548, 552): "We see no merit in the * * * contention, advanced at Special Term and * * * here, that [defendants] should be estopped * * * because [they] * * * knew of and consented to [plaintiffs'] performance of legal duties while [nonresidents]. It has often been held that estoppel does not lie against the State, a municipality or their agencies where, as here, the governmental body was exercising its statutory or regulatory authority, and this is true irrespective of any representation or opinion by any of that body's officers or employees *(City of New York v Wilson & Co.,* 278 NY 86, 99-100; *Matter of Town of Cornwall v Diamond,* 39 AD2d 762; see 21 NY Jur, Estoppel, § 76)."[4]

The fact that the plaintiffs' conduct in leaving New York and assuming residency out-of-State was not covert, but deliberate, open and with the aid of defendant New York City Housing Authority Police Department does not warrant a different conclusion (see *Matter of Gavigan v McCoy, supra).*

Further, "[a]n erroneous application of law does not relieve

4. The introductory sentence of the quoted passage has been interpolated to reflect the facts of the instant appeal.

a public official from the obligation to apply and enforce it correctly thereafter. *(Rubel Corp. v City of New York,* 73 NYS 813, affd 274 App Div 925.)" *(Matter of Albert Simon, Inc. v Myerson,* 36 NY2d 300, 303.) Of added import are the observations delineated in *City of New York v Wilson & Co.* (278 NY 86) which involved an action of ejectment brought by the city. The defendant therein claimed that the city was estopped from asserting its rights by virtue of reports of an engineer employed by the city and by the Corporation Counsel to the effect that defendant had acquired adverse possession and by the fact that subsequent to 1871 the city made a number of grants of land under water. The Court of Appeals declared (at pp 99-100): "In view of the *manifest intent* shown when chapter 574 of the Laws of 1871 is read in its entirety * * * which holds land under water as well as the piers and wharves inalienable from 1871 on, we are not bound by the reports of an engineer in the Dock Department of the City of New York in 1922, or of the Corporation Counsel in 1910 to the effect that the defendant had acquired adverse possession. Nor are we bound by the fact, that subsequent to 1871, the city made a number of grants of land under water. The city is not estopped from asserting its rights by these inconsistent acts, since *the errors of law of city employees and officers are not binding upon the city."* (Emphasis supplied.)[5]

It is well recognized in this State "that qualifications for public office may be established by the Legislature so long as these qualifications do not work arbitrary exclusions from office *(Matter of Callahan,* 200 N. Y. 59, 61; *People ex rel. Devery v. Coler,* 173 N. Y. 103, 118; *Rogers v. Common Council of Buffalo,* 123 N. Y. 173, 188.) * * * Residence has been a traditional qualification for holding public office in New York. (See Public Officers Law, § 3 * * *) It seems apparent that the object sought to be achieved by prescribing residency as a requirement for holding public office is to obtain public officials who are knowledgeable about and concerned with the affairs of the unit of government they seek to serve. Is there a reasonable relationship between residency and this legislative

5. While the doctrine of equitable estoppel applies to municipal corporations under certain circumstances, "it may not be invoked to prevent a municipality from disclaiming the unauthorized or unlawful acts of its employees and thereby give vitality to otherwise illegal conduct *(Town of Guilderland v Swanson,* 41 Misc 2d 398, mod 29 AD2d 717, affd 24 NY2d 872; *Abell v Hunter,* 211 App Div 467, affd 240 NY 702; *People ex rel. Sweet v Board of Supervisors of St. Lawrence County,* 101 App Div 327)" *(Matter of Moritz v Board of Educ.,* 60 AD2d 161, 166).

objective so that a classification between residents and nonresidents does not violate the equal protection doctrine of the Federal and State Constitutions? The court is of the opinion that such a relationship does exist." *(Matter of De Hond v Nyquist,* 65 Misc 2d 526, 528-529.) Recently, the Court of Appeals in discussing the residency requirements embodied in CPLR 9406 (subd 2) for admission to the New York State Bar, declared: "it is settled that a State may not premise an individual's right to engage in his chosen occupation within its borders solely on residence * * * This is not to say, of course, that the privileges and immunities clause forbids a State from ever differentiating between residents and nonresidents. Matters which directly implicate its sovereignty, such as voting *(Dunn v Blumstein,* 405 US 330) or *entitlement to public office (Chimento v Stark,* 414 US 802), furnish ready examples of areas in which a State may constitutionally condition eligibility upon residence" *(Matter of Gordon,* 48 NY2d 266, 271 [emphasis supplied]; see, also, *Hendon v Board of Educ.,* 281 NY 757; cf. *Matter of Contento v Kohinke,* 42 AD2d 1025).

The full implication of the residency mandate embodied in the Public Officers Law may be gleaned from reading an informal opinion of the Attorney-General relevant to the residency requirement of police department personnel: "Public Officers Law, § 3(2) superseded all city and village charters, general, special and local laws and ordinances, rules and regulations relating to residency for appointment of police department personnel and *can not be amended by local legislative action.* It imposes a *uniform state standard.* However, Public Officers Law, § 30(4) authorizes local action in certain circumstances allowing a municipality to require police department personnel, after appointment, to reside in or near the municipality where serving. Different requirements apply to applicants and active police force members" (1974 Atty Gen [Inf Opns] 252; emphasis supplied).

It may, therefore, be concluded that the municipality has no power to amend the Public Officers Law to negate the State-wide standard of imposing residency within the State as a qualification for eligibility for office and continued retention in office as a member of a police force within the purview of that law. "A distinction is drawn * * * between municipal acts which are *ultra vires* in the primary sense—that is, utterly beyond the jurisdiction of the municipality, therefore precluding an estoppel based upon detriment in reliance—and munic-

ipal acts which are *ultra vires* in the secondary sense—that is, irregular exercises of a basic municipal power, which may be the basis for an estoppel" *(Debold v Township of Monroe,* 110 NJ Super 287, 295; see, also, Antieau, Municipal Corporation Law, § 16A.04).[6]

Accordingly, the order of the Supreme Court, New York County (ASCH, J.), entered July 3, 1979, granting plaintiffs a preliminary injunction in this declaratory judgment action, denying the defendants' motion to dismiss the complaint and denying the plaintiffs' cross motion for summary judgment as premature, should be modified, on the law, to the extent of denying plaintiffs' motion for an injunction *pendente lite,* and granting defendants' motion to dismiss the complaint to the extent of granting them final judgment by way of judicial declaration that the memoranda issued by the Chief of Housing Authority Police on December 7, 1978 was constitutional, lawful and enforceable against plaintiffs, and, as so modified, the order should be affirmed.

MURPHY, P. J., concurs with ROSS, J.; BIRNS, J., concurs in a separate opinion; FEIN and LUPIANO, JJ., dissent in an opinion by LUPIANO, J.

Order, Supreme Court, New York County, entered on July 3, 1979, modified, on the law, to the extent of declaring that Police Officers of the Housing Authority of the City of New York are public officers within the meaning of section 30 of the Public Officers Law and subject to the residency requirements therein, but defendants are equitably estopped from imposing these requirements on plaintiffs, and, as so modified, the order is affirmed, without costs and without disbursements.

---

**6.** For an analysis of principles governing application of equitable estoppel to municipality, embracing public policy and the rationale of *Seif v City of Long Beach* (286 NY 382; see *Lutzken v City of Rochester,* 7 AD2d 498).