**ERIKA, INC.**

**v.**

**The UNITED STATES.**

**No. 374-77.**

United States Court of Claims.

Oct. 22, 1980.

Stephen H. Oleskey, Boston, Mass., attorney of record, for plaintiff. Timothy H. Gailey and Hale & Dorr, Boston, Mass., of counsel.

Dwight D. Meier, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant. Margaret Porter, Dept. of Health and Human Services, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG, BENNETT, and SMITH, Judges, en banc.

ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

This case, before us on cross-motions for partial summary judgment,[1] presents two questions under part B of the Medicare program (Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (1976)): (1) are any determinations relating to benefits under part B judicially reviewable, and (2) if the determinations here involved are re-

1. At the time the motions were filed, defendant informed the court that the parties were involved in settlement negotiations over count I of the three-count supplementary petition. Neither party has addressed the issues in that portion of the complaint. This opinion, therefore, addresses only the issues under counts II and III.

viewable, were the bases upon which they were made invalid because they are inconsistent with the statutory provisions governing those determinations? We answer both questions affirmatively. Accordingly, we grant the plaintiff's and deny the defendant's motions for partial summary judgment.

I.

A. The Medicare Program, which pays portions of certain medical expenses primarily for persons more than 65 years old, is divided into two parts. Part A is a hospital insurance program which covers all qualifying persons, and part B is a voluntary supplemental insurance program. Coverage under both parts of the program was extended on July 1, 1973, to any person, regardless of age, who requires kidney maintenance dialysis, and is otherwise covered by the Act. 42 U.S.C. § 426(e).

Part A of Medicare, *id.* §§ 1395c to 1395i–2, pays the costs of inpatient hospital services and extended care services. *Id.* §§ 1395c, 1395d. Patients receive the services without charge. Costs are paid out of the Federal Hospital Insurance Trust Fund, which is supported primarily by Social Security taxes. *Id.* § 1395i. Generally a hospital agrees to become a "provider of services" under the program and is reimbursed for its "reasonable costs" through a fiscal intermediary designated by the Secretary of Health, Education, and Welfare. *Id.* §§ 1395f, 1395h.[2] If a provider is dissatisfied with the amount its intermediary awards, and if the amount in controversy is $10,000 or more, it may seek a hearing before the Provider Reimbursement Review Board. *Id.* § 1395*oo*(a). That Board's decision may be appealed to the Secretary. *Id.* § 1394*oo*(f).

Part B of Medicare, *id.* §§ 1395j–1395w, pays for the "reasonable charges" of physicians and various health services such as x-rays and laboratory tests. *Id.* §§ 1395*l*, 1395x(s). Individual participants pay premiums for coverage, which go into the Federal Supplementary Medical Insurance Trust Fund. *Id.* § 1395t. Part B benefits are administered by insurance carriers,[3] pursuant to contracts entered into with the Secretary. *Id.* § 1395u. The carriers set reasonable charges for 80 percent of which an individual, or a provider as assignee, may be reimbursed pursuant to guidelines set out in the Medicare statute and regulations. *Id.* The statute provides for "a fair hearing by the carrier" if a dispute arises over payment and the amount in controversy is $100 or more. *Id.* § 1395u(b)(3)(C). There is no provision for review of the carrier's decision by the Secretary or any governmental administrative agency.

B. Plaintiff (Erika) is a major distributor of equipment and supplies used in kidney dialysis. It sells to hospitals, health care facilities, and patients items it produces and items manufactured by others. The Prudential Insurance Company of America (Prudential) was designated as plaintiff's carrier, and therefore was authorized to "make determinations of the rates and amounts of payments required . . . to be made to providers of services . . . [on] a reasonable charge basis" (*id.* § 1395u(a)(1)(A)). Under the statute Prudential was to determine "reasonable charges" that were to be no greater than:

> the prevailing charge level that, on the basis of statistical data and methodology acceptable to the Secretary, would cover 75 percent of the customary charges made for similar services in the same locality during the last preceding calendar year elapsing prior to the start of the

2. In 1980 the name of the department was changed to Health and Human Services. Because the actions involved in this case predated that change, references are to the predecessor department.

3. A carrier is an organization "lawfully engaged in providing, paying for, or reimbursing the cost of, health services under group insurance policies or contracts, medical or hospital service agreements, membership or subscription contracts, or similar group arrangements, in consideration of premiums or other periodic

fiscal year in which the bill is submitted or the request for payment is made. *Id.* § 1395u(b)(3).[4]

Because Erika's sales represented almost all the sales of the relevant materials in the locality where its business was based, Prudential used Erika's charges to set the reasonable charges for dialysis equipment and supplies. It treated Erika's charges as both the customary charges for a seller and the prevailing charges for the locality. Erika's prices were listed in the company's annual catalogues, effective July 1 of each year. The company also issued from time to time catalogue supplements that reflected changes in price. Beginning with the July 1974 issue, plaintiff sent to Prudential its yearly catalogue and supplements.

Prudential determined Erika's "reasonable charges" for its fiscal years (which began on July 1)–and hence the basis for its reimbursement–by reference to Erika's charges set forth in its annual catalogue effective July 1 of the preceding year. The reasonable charges for the fiscal year beginning July 1, 1975, therefore, were those listed in the July 1974 catalogue, and the reasonable charges for the year beginning July 1, 1976, were those listed in the July 1975 catalogue. Prudential did not change those "reasonable charges" to reflect Erika's price increases shown in the company's catalogue supplements. Prudential reimbursed Erika for 80 percent of the reasonable charges it thus determined. *Id.* § 1395*l* (a)(1).

In this suit Erika challenges Prudential's refusal to increase Erika's "reasonable charges" to reflect its price increases made during the intervals between the effective dates of its annual catalogues. Count II of the complaint concerns charges for heparin, an anticlotting drug used in dialysis, from July 1974 through May 1976. The heparin Erika sold was manufactured by other firms. Plaintiff states that a shortage of meat from which the drug is produced caused a severe shortage of heparin beginning in 1974, that manufacturers of the drug raised their prices to Erika, and that Erika increased its prices for heparin five times during this period to reflect its increased costs in obtaining the drug. Although Erika sent Prudential its supplements showing the increased prices, Prudential reimbursed Erika on the basis of the July 1, 1974 prices until May 26, 1976. It then approved Erika's charges for heparin reflected in Erika's March 1, 1976 supplement as the reasonable charges for future sales.

Prudential, however, refused to increase its prior reimbursements to reflect Erika's four earlier price increases, on the ground it had no authority to make such retroactive adjustments. After a hearing, the hearing officer (a Prudential employee) upheld the determination.

Count III seeks reimbursement to reflect the difference between the higher prices Erika actually charged for other equipment and supplies sold to Medicare beneficiaries (based upon the increases set forth in the supplemental catalogues) and the July 1 prices upon which Prudential based its payments. Despite periodic requests from Erika, Prudential refused to make any changes in Erika's "reasonable charges" to reflect those interim price changes. After a hearing, the hearing officer denied Erika any additional payments.

II.

The plaintiff invokes our jurisdiction under the Tucker Act, 28 U.S.C. § 1491, which gives us jurisdiction over "any claim

charges payable to the carrier." 42 U.S.C. § 1395u(f)(1).

4. In 1977 Congress amended this section by changing "the fiscal year" to "the twelve-month period (beginning July 1 of each year)," due to a change in the federal fiscal year. 42 U.S.C. § 1395u(b)(3) (Supp. I 1977). Prior to 1976 the government's fiscal year ran from July 1 to June 30. Beginning in 1976, however, the government's fiscal year began on October 1. Despite the change in language, the effect of the provision remains the same. The time period from July 1 to June 30 is now called "the fee screen year." Since all the claims in this case arose prior to 1977, the earlier language is applicable here.

against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department." [5] The plaintiff contends that the refusal of Prudential to determine its "reasonable costs" under part B of Medicare to reflect the interim increases in Erika's charges above those contained in its annual catalogues violated the fifth amendment to the Constitution and the provisions of the Social Security Act and the implementing regulations governing the determination of "reasonable costs." On its face, the petition states a claim within our jurisdiction under the Tucker Act.

The defendant contends, however, that under 40 U.S.C. § 1395ff Congress made benefit determinations under part B of Medicare not judicially reviewable. That section provides:

(a) Entitlement to and amount of benefits

The determination of whether an individual is entitled to benefits under part A or part B, and the determination of the amount of benefits under part A, shall be made by the Secretary in accordance with regulations prescribed by him.

(b) Appeal by individuals

(1) Any individual dissatisfied with any determination under subsection (a) of this section as to–

(A) whether he meets the conditions of section 426 or section 426a of this title, or

(B) whether he is eligible to enroll and has enrolled pursuant to the provisions of part B of this subchapter, or section 1395i–2 of this title, or section 1819, or

(C) the amount of benefits under part A (including a determination where such amount is determined to be zero)

shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

(2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1,000.

(c) Appeal by institutions or agencies

Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services, or with any determination described in section 1395cc(b)(2) of this title, shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

Section 405(g) of the Social Security Act permits any individual, after a final decision of the Secretary made after a hearing to which he was a party, to obtain review of the Secretary's decision by filing suit in the district court within 60 days. This provision would not permit Erika to obtain review of Prudential's denial of additional payment to it because that denial did not involve any "final decision" of the Secretary.

The government argues that under section 1395ff, the only issue upon which a hearing may be had before the Secretary under part B is whether an individual is entitled to benefits; and that there is no right to a hearing–and hence no right to judicial review–of a determination of the amount of benefits under part B, since the statute provides for a hearing on and judicial review of "amount" determinations only under part A. It contends that Erika's

5. The plaintiff also asserts we have jurisdiction under section 10(b) of the Administrative Procedure Act, 5 U.S.C. § 703. In view of our holding that we have jurisdiction under the Tucker Act, we find it unnecessary to consider this additional basis of jurisdiction. *But cf. Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

claim relates solely to the amount of benefits to which it is entitled and that section 1395ff therefore makes nonreviewable Prudential's refusal to pay Erika the additional amounts it seeks. The government argues further that the procedure provided in section 1395ff–a hearing before the Secretary and review in the district court–was intended to be the exclusive method for obtaining judicial review of Medicare determinations. In effect, the government argues that in section 1395ff Congress repealed by implication a portion of our jurisdiction under the Tucker Act.

We have rejected a similar contention by the government that section 1395ff and the provisions providing for district court review of determinations by the Secretary after a hearing bar us from reviewing decisions under part A of Medicare. In *Goldstein v. United States*, 201 Ct.Cl. 888, *cert. denied*, 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973), we held that with respect to the contention that a determination by a fiscal intermediary Provider Appeals Committee (1) "rested upon procedures which were constitutionally invalid or violative of the governing statute," or (2) "may have substantially violated the Due Process Clause of the Fifth Amendment or the provisions of the governing statute ... the court has jurisdiction under 28 U.S.C. § 1491 and the finality provisions of the medicare legislation do not bar judicial review." 201 Ct.Cl. at 889–90.

In *Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976) *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), we held that we had jurisdiction under the Tucker Act to review the contention that the decision of a Provider Appeals Committee denying a Medicare part A provider's claim to certain payments violated the Medicare statute. 210 Ct.Cl. at 58, 536 F.2d at 351. We stated that reading the Medicare provision there involved [6] to preclude judicial review would "prevent all review of very large categories of cases and issues, including constitutional questions, and ... accord absolute finality to adjudications by private organizations .... Such a result would be of doubtful constitutional validity and would undermine the normal presumption in favor of judicial review." *Id.*, 536 F.2d at 350 (footnote omitted). We announced the following standard for judicial review of Medicare provider disputes:

> Where the Medicare statute provides for review, providers and courts must follow the specified procedures and limitations; in other cases, a provider may obtain judicial review, under the general jurisdictional provisions which are applicable, at least so far as to ensure compliance with statutory and constitutional provisions. In this court, 28 U.S.C. § 1491 (the Tucker Act) is the pertinent jurisdictional provisions both because of plaintiff's contract with the Government and also because the Medicare legislation, fairly read, mandates appropriate payment to providers.

*Id.*, 563 F.2d at 351 (footnote and citation omitted).

■ Although *Goldstein* and *Whitecliff* involved the reviewability of benefit determinations under part A, their reasoning is no less applicable to benefit determinations under part B. Indeed, our rulings in those cases did not specifically focus upon either part A or part B, but, more broadly, were that we have jurisdiction under the Tucker Act to review Medicare determinations challenged as violating constitutional or statutory provisions. Here the plaintiff contends that there has not been "compliance with statutory and constitutional provisions" (*Whitecliff, supra*, 210 Ct.Cl. at 58, 536 F.2d at 350) by Prudential in determining Erika's benefits. Our conclusion in *Whitecliff* that the mere lack of explicit provisions for judicial review does not bar

6. The provision in question was § 405(h) of the Social Security Act, made applicable to Medicare through § 1395ii. It limited review of a determination by the Secretary under the Act to that provided in § 405(g). *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The government claimed in *Whitecliff* that § 405(h) also barred review of Medicare cases in this court. The court, however, refused to extend *Salfi* to such cases. 210 Ct.Cl. at 57–58, 536 F.2d at 350–51.

consideration of those Medicare claims under the Tucker Act is equally sound when applied here.

The Supreme Court has recognized that even an explicit provision barring judicial review does not necessarily do so in all cases. Section 211(a) of title 38 makes decisions of the Veterans' Administrator "final and conclusive" and provides that "no . . . court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise." Despite this sweeping language, the Supreme Court held in *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), that the federal courts could entertain a constitutional challenge to the Administrator's refusal to provide veterans' educational benefits to a conscientious objector who performed civilian service in lieu of military service. Noting that section 211(a) did not explicitly bar judicial consideration of Robison's constitutional claims (*id.* at 367, 94 S.Ct. at 1165), the Court concluded that "neither the text nor the scant legislative history of § 211(a) provides the 'clear and convincing' evidence of congressional intent required by this Court before a statute will be construed to restrict access to judicial review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)." *Id.* 415 U.S. at 373–74, 94 S.Ct. at 1168–1169.

Similarly, we have recognized that although the Civil Service Retirement Act provided that the decisions of the Civil Service Commission on questions of disability and dependency "are final and conclusive and are not subject to review," a court might set aside a Commission determination "where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination.'" *Scroggins v. United States,* 184 Ct.Cl. 530, 533–34, 397 F.2d 295, 297, *cert. denied,* 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968), quoting *Gaines v. United States,* 158 Ct.Cl. 497, 502, *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962). *See also Polos v. United States,* Ct.Cl., 621 F.2d 385 at 391 n. 9 (1980).

If, as those cases hold, the courts may entertain constitutional and statutory challenges to administrative action even where the governing statute explicitly bars judicial review, *a fortiori* the courts may do so where, as here, the alleged bar to judicial review is merely implicit in the statutory language and structure.

The government contends, however, that the legislative history of section 1395ff evidences a clear congressional intent to bar judicial review of any benefit determinations under part B of Medicare. It refers to the following statement in the Senate Committee Report on the Medicare bill:

> Under the supplementary plan [part B], carriers, not the Secretary, would review beneficiary complaints regarding the amount of benefits, and the bill does not provide for judicial review of a determination concerning the amount of benefits under part B where claims will probably be for substantially smaller amounts than under part A.

S.Rep.No.404, 89th Cong., 1st Sess. 54–55, *reprinted in* [1965] U.S.Code Cong. & Ad. News, pp. 1943, 1995. The government also cites the following statement by Senator Bennett made during Senate debate on a 1972 amendment that changed the language of section 1395ff(b):

> The situations in which medicare decisions are appealable to the courts were intended in the original law to be greatly restricted in order to avoid overloading the courts with quite minor matters. The law refers to "entitlement" as being an issue subject to court review and the word was intended to mean eligibility to any benefits of medicare but not to decisions on a claim for payment for a given service.

118 Cong.Rec. 33,992 (1972).

These statements do not constitute "clear and convincing" evidence (*Johnson, supra,* 415 U.S. at 373, 94 S.Ct. at 1168) the Congress intended to bar judicial review of constitutional and statutory challenges to

benefit determinations under part B of Medicare. The fair import of these statements is that Congress intended to bar judicial review of the amount of a particular benefit determination–as, for example, a carrier's determination that $50 rather than the $100 a physician charged was a reasonable amount for the services. Indeed, this court implicitly so ruled in *Goldstein, supra,* when it stated that "it is precluded by 42 U.S.C. § 1295ff and § 405(h) from reviewing or overturning the determination of the Provider Appeals Committee *except* insofar as such determination" rests upon constitutional or statutory error. 201 Ct.Cl. at 889 (emphasis supplied).

What this legislative history indicates is that Congress wanted to avoid flooding the courts with a large number of small claims in which beneficiaries challenged the amount of reimbursement allowed for a particular service or product. *Cf. Johnson, supra,* 415 U.S. at 370–72, 94 S.Ct. at 1167–1168. That this was the primary purpose of Congress in the provision is confirmed by the fact that under part A of Medicare Congress barred judicial review of the Secretary's determination if the amount in controversy is less than $1,000.

The congressional objective to prevent the courts from being burdened with a large number of small individual claims seeking greater reimbursement would not be thwarted by permitting judicial review of contentions that particular benefit determinations violated constitutional or statutory provisions. For once a particular contention of that kind had been adjudicated, that issue would be settled, and there would be no occasion for further litigation of the point. *Cf. Johnson, supra,* 415 U.S. at 373, 94 S.Ct. at 1168.

III.

A. In one significant respect the basis upon which Prudential determined Erika's "reasonable charges" did not comply with the Medicare statute and the implementing regulations.

As noted in section I.A. above, the statute provides that a reasonable charge (referred to as the "prevailing charge" in the statute) cannot exceed 75 percent of the customary charge for similar services in the locality "during the last preceding calendar year elapsing prior to the start of the fiscal year in which the bill is submitted or the request for payment is made." 42 U.S.C. § 1395u(b)(3). The Secretary's regulations similarly provide for a maximum reasonable (prevailing) charge of not more than 75 percent of the customary charge "during the calendar year preceding the start of the fiscal year in which the claim is submitted or the request for payment is made." 20 C.F.R. § 405.504(a)(2)(i) (1976).[7] The touchstone for determining reasonable charges under both the statute and the regulations is the customary charge "during the calendar year" preceding the fiscal year for which reimbursement is sought.

In the present case Prudential treated Erika's charges as the customary charges (and the prevailing charges) for the service in the locality. Prudential, however, did not base its determination of Erika's "reasonable charges" upon Erika's customary charges "during" the preceding calendar year. Instead, it looked only to Erika's charges on July 1, the first day of Erika's fiscal year. In so doing, Prudential ignored the statutory directive, repeated in the regulation, that it was to make its determination of Erika's charges for the current fiscal year on the basis of those charges during the preceding calendar year. The statute and regulations did not permit Prudential to consider only Erika's charges on a single day in the middle of the preceding calendar year.

If Erika's charges had remained the same during the entire preceding calendar year,

7. References to the regulations are to the 1976 Code of Federal Regulations unless otherwise indicated. In 1977 the entire chapter involved here was moved to become chapter IV of title 42 concerning Public Health, without major changes. Subsequent to 1976, however, when the federal fiscal year was changed, the regulation, like the statute, was altered. 42 F.R.D. § 405.504(a)(2)(i) (1979). *See* note 4, *supra.*

Prudential's error would have been immaterial. Erika, however, increased its charges during the preceding calendar year. Prudential's method of determining Erika's "reasonable charges" did not reflect those increases.

Prudential's failure to comply with the statutory directive is shown by the carrier's determination of Erika's "reasonable charges" for the drug heparin. For the fiscal year beginning July 1, 1975 (except for the 35 days after March 26, 1976, when Prudential based its reimbursement of Erika's charges on the latter date), Prudential reimbursed Erika on the basis of Erika's July 1, 1974 charges. In September 1974, Erika increased its charges for heparin, but the "reasonable charges" Prudential allowed did not reflect that increase.

The statutory standard that Erika's "reasonable charges" be calculated on the basis of Erika's charges during the preceding calendar year required Prudential's determination to reflect all price changes the provider made during that entire year. With respect to Erika's "reasonable charges" for heparin for the fiscal year 1975–76, this meant that Prudential's determination had to reflect the September 1974 price increase. Conversely, if during the first 6 months of 1974 Erika's charge for heparin was lower than its charge on July 1 of that year, Prudential should have taken that fact into account.

On the present record, we cannot determine what Erika's customary charges were for its drugs and services for each of the calendar years involved. Nor do we attempt to prescribe the method by which the carrier should make that determination. Prudential might decide to average the different charges made during the calendar year, or to allocate the difference charges on the basis of the time each was in effect, or to determine the mean charge, or to use some combination of these methods. Perhaps Prudential can devise a better method of calculation.

The selection of the appropriate method of calculation is for Prudential to determine in the first instance. The carrier has considerable discretion to adopt whatever method of calculation it concludes would most accurately measure and reflect Erika's customary charges during the preceding calendar year. Our point simply is that under the statute and regulations, Prudential cannot ignore the changes in Erika's prices during the preceding calendar year and base its determination solely upon Erika's catalogue prices as of July 1.

In determining Erika's reasonable charges and reimbursing the provider for 80 percent of that amount, Prudential is acting for the Secretary pursuant to delegated statutory authority and the Secretary's regulation. Prudential is an "administrative or executive body" under 28 U.S.C. § 1491, to which we may "remand appropriate matters ... with such direction as [we] may deem proper and just." *Cf. Weinreb v. United Medical Service, Inc.*, 392 F.Supp. 45, 46 (S.D.N.Y.1975); *Kuenstler v. Occidental Life Insurance Co.*, 292 F.Supp. 532, 534–35 (C.D.Cal.1968). We therefore shall remand the case to Prudential to redetermine Erika's reasonable charges in accordance with this opinion.

B. Erika contends, however, that its "reasonable charges" for which the statute provides reimbursement are the amounts actually billed to its customers rather than its charges during the preceding year, and that Prudential therefore was required to increase the amount of reimbursement whenever Erika itself increased its prices. As we have explained in section III.A., however, Congress has provided that the reasonable charge cannot exceed the prevailing charge of 75 percent of the customary charges during the preceding calendar year.

Erika also states that because all of its sales were made through its headquarters in New Jersey and its Medicare claims were processed by Prudential (the carrier serving New Jersey) rather than by carriers throughout the country where Erika's patients were located, Erika's customary charges became the prevailing charges in the locality, which Prudential then used to determine Erika's reasonable charges. Eri-

ka contends that if its patients had asserted their own claims for reimbursement, rather than assigning the claims to Erika, they would have received higher reimbursement from other carriers throughout the country than Erika received from Prudential.

Of course, there is no way of knowing the amounts other carriers would have allowed if Erika's patients rather than Erika had presented the claims for reimbursement. Erika's contention that the amounts of reimbursement the other carriers would have allowed would have been higher than Prudential's payments thus is wholly speculative.

An equally serious flaw in Erika's argument is that its predicament, if such it be, is of its own choosing. Erika, for reasons of its business convenience and advantage, decided to accept assignments of its patients' Medicare claims rather than to collect directly from the patients and let the latter seek reimbursement from Medicare carriers in their locality. Having made that election, Erika cannot now legitimately complain because Prudential treated the claims Erika presented as claims by Erika rather than claims by Erika's patients. Although Erika's right to assert those claims derived from the assignment of the claims by the patients, it was not unreasonable for Prudential to deal with the claims presented by Erika as Erika's claims.

C. With respect to the drug heparin, which Erika did not manufacture but merely resold, Erika increased its prices five times between the promulgation of its July 1, 1974 price catalogue and May 26, 1976. It made these price increases allegedly solely because of price increases imposed by Erika's suppliers. On the latter date Prudential ruled that it would use Erika's then current higher price as a basis for future payments. Prudential, however, declined to give Erika any retroactive adjustment to reflect its past higher prices. It refused to make that retroactive adjustment either solely or primarily because of Intermediary Letter 72–13, in which the Department of Health, Education, and Welfare instructed carriers that adjustments in reimbursement payments on equitable grounds "may apply prospectively only." Erika contends that Prudential's reliance upon this letter was improper, and we agree.

As Prudential points out, Intermediary Letter 72–13 was issued in May 1972. It was designed to explain and to aid carriers in applying a Price Commission ruling concerning base prices for Medicare services during Phase II of the Wage and Price Control Program. It was in explaining the circumstances in which upward price adjustments could be made for equitable considerations that the letter stated that those adjustments "may apply prospectively only."

In terms, the letter applied only to adjustments for the fiscal year 1973. Moreover, as the hearing officer noted, Intermediary Letter 72–13 subsequently was declared to be "obsolete." The hearing officer concluded, however, that this latter action "does not necessarily negate its historical precedent." For this latter conclusion, the hearing officer relied upon two letters written by officials of the Department of Health, Education, and Welfare expressing their opinion that retroactive equity adjustments could not be made.

Prudential's reliance upon this letter, which did not cover the years in dispute here and which was declared "obsolete," was misplaced. Similarly, the two statements of the HEW officials which the hearing officer found convincing cannot be deemed to reflect the considered judgment of the Secretary. We therefore conclude that since Prudential's denial of a retroactive equitable adjustment rested either completely or primarily upon this Intermediary Letter, it cannot stand. Accordingly, we vacate that determination and remand this aspect of the case to Prudential to reconsider its refusal to award retroactive benefits without reliance upon the Intermediary Letter or the two other opinions.

In so doing, we indicate no views on whether a retroactive adjustment should be made. That is a matter for Prudential to determine, in light of whatever governing

standards and policies the Secretary has promulgated for retroactive adjustments.

D. In a period of rapidly rising costs and prices, such as the present, a provision requiring reimbursement upon the basis of charges during the prior calendar year may result in unfairness. It is Congress, however, which provided that standard for reimbursement under Medicare. If any change is to be made in that standard, it must come from Congress, not from this court.

The regulations give carriers substantial flexibility in setting reimbursement rates to look at more than just the customary and prevailing charges. In determining reasonable charges a carrier also may consider "[o]ther factors that may be found necessary and appropriate with respect to a specific item or service to use in judging whether the charge is inherently reasonable." 20 C.F.R. § 405.502(a)(4). Prudential apparently did consider Erika's special circumstances in connection with heparin when in May 1976 it granted Erika an increase that allowed the provider to be reimbursed at its current charges instead of its charges for the preceding calendar year. The determination whether to grant particular adjustments and permit departures from prevailing charges during the preceding calendar year, however, is within the discretion of the carrier. We cannot direct Prudential whether or how to exercise that discretion in a particular case.

E. Finally, Erika contends that Prudential's refusal to reimburse it on the basis of its current charges denied it due process and equal protection in violation of the fifth amendment to the Constitution. These constitutional claims are insubstantial. It was reasonable for Congress, in order to control Medicare costs and to provide an orderly system for administering this vast and complex program, to base reimbursement upon charges made during the prior year. Erika's participation in the Medicare program was voluntary. The limitations upon reimbursement that Erika here challenges did not deny Erika due process or equal protection. *See, e. g., Califano v. Aznavorian*, 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

## CONCLUSION

Plaintiff's motion for partial summary judgment is granted, and defendant's motion for partial summary judgment is denied. The case is remanded to the Prudential Insurance Company of America for further proceedings in accordance with this opinion.

NICHOLS, Judge, concurring:

I agree in the result and in the court's able opinion except as specified. I write separately on jurisdiction because I continue to believe that a practical necessity exists to advert to the doctrine of strict construction of the consent to be sued whenever we allow a claim that is in any way a departure from our usual routine. Since this is our first claim by a Medicare Part B provider, the instant case is novel in that sense. Defendant is likely to abandon here any but *pro forma* insistence on jurisdictional objections when we have once established a precedent in favor of our own jurisdiction. Defendant before us does not waste time arguing issues we already have decided. Strict construction being jurisdictional, however, defendant always can invoke it in petitioning for certiorari without having said much or anything to alert us. We should, therefore, routinely show we have considered jurisdiction and have an answer, if we do, to all possible jurisdictional problems, whether or not urged before us by defendant.

When one considers the amazing changes that have occurred over a century of time in the meaning of the Constitution and laws, generally, as construed by the U.S. Supreme Court, the infrequency of its deviations from strict construction of the consent to be sued is almost anomalous. The doctrine is relatively firm when all else is in

flux. It was already old when applied to the newly passed Tucker Act in *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889), and we have just now seen a litigant whose cause we favored stranded on it just as was claimant Jones. *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). It is true that Mr. Justice Homes' colleagues allowed him to say for them, referring to the Tucker Act, in *United States v. Emery*, 237 U.S. 28, 32, 35 S.Ct. 499, 500, 59 L.Ed. 825 (1915):

> * * * [It is an] inadmissible premise that the great act of justice embodied in the jurisdiction of the Court of Claims is to be construed strictly and read with an adverse eye. * * * [Cases omitted].

Though the result of that case has stood, the language does not fairly and fully represent the policy of the Supreme Court then or now. Holmes himself in *United States v. Milliken Imprinting Co.*, 202 U.S. 168, 26 S.Ct. 572, 50 L.Ed. 980 (1906), thought he was being liberal to allow us to reform a contract and enforce it as reformed, though the Act then specifically granted equity jurisdiction. *Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966), is the only holding in conflict with the preponderance of cases. The quote proves only that nobody dared to edit Holmes' dicta. It, and the Lincoln quote that decorates our lobby, should never be reproduced without a qualifying reference to the doctrine of strict construction of the consent to be sued, and a tolling of the bell for all the litigants who have relied on such rhetoric in vain.

Among its other manifestations, the doctrine overturns the usual rule that repeals by implication are not favored. Partial repeals of the Tucker Act by implication are favored. Indeed, we ourselves recognized that such a partial repeal by implication did occur when we took jurisdiction of some Medicare Part A claims, but were careful to spell out, only those for which no district court remedy was provided, as the present opinion of this court correctly states in discussing *Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). It is scarcely necessary to point out that in the absence of other provisions, all Medicare provider claims could have been sued on under 28 U.S.C. § 1491 (Tucker Act) nor that the provisions which reduced the number to less than all made no express reference to the Tucker Act and must, therefore, have effected the partial repeal they did effect by implication only. And by inadvertence too, quite likely.

Congress is aware how easily it can effect a partial repeal of the Tucker Act by implication, and when it adverts to the problem and does not desire such partial repeal, it is careful to say so. A conspicuous long standing example is 28 U.S.C. § 1346(a). A more recent one is Pub.L.No.92–562, Act of October 25, 1972, 86 Stat. 1176, codified 28 U.S.C. § 2409a. In *Fiorentino v. United States*, 221 Ct.Cl. —–, 607 F.2d 963 (1979), *cert. denied* 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980) we discuss the effect of a partial implied repeal of the Tucker Act, there involved, point out its involvement in *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), and show that sovereign immunity (and the need of an express consent to be sued) greatly strengthens the probability that a partial repeal of the Tucker Act by implication has been effected in any class of case if the question arises.

There is, however, a big difference between an implied partial repeal of the Tucker Act in course of providing a seemingly adequate remedy elsewhere than in this court (actuated, perhaps, by a commendable desire to guarantee us an easy life with long vacations) and such an implied partial repeal in course of expressly denying relief elsewhere. Much will depend on the facts, but I do not think the Supreme Court has yet said or done anything to disable us from requiring defendant to show us express repeal of the Tucker Act in such circumstances. That is the effect of what we do here today. I deem it possible the momentum the Supreme Court has acquired on the strict construction issue may carry it to the length defendant's argument here would require, but I think we should let them get there first. It never does for a lower court to anticipate Supreme Court decisions. If

anyone is to make such a flagrant and utter repudiation of the Holmes' *Emery* case rhetoric, it should be the Supreme Court, not ourselves. We can at least enjoy deeming ourselves to be in this area "the nation's conscience" until we are reversed, and the true straitness of the consent to be sued pointed out to us once again.

The difference is one that will appeal to most minds, but it is important not to overstress it. In our reasoning on consent to be sued issues, it is an error to be governed by the thought that the claimant must have a remedy here because he has none elsewhere. Our now reversed decision in *Mitchell* was infected by this fallacy. As I there pointed out, concurring, Congress has historically withheld its consent to be sued on many classes of claims over long periods, intentionally, preferring to handle itself the importunities of the claimants. The most that can be made of our *Mitchell* reasoning is that in some instances it will be a useful guide to legislative intent if otherwise unascertainable. It is helpful to ask sometimes whether a contemplated result is one the Congress would have wanted, if it had adverted to the problem. This reasoning cannot be used to clarify a consent to be sued, not stated in express terms, but perhaps it can if consent was once expressly granted and it is a later withdrawal of consent that is sought by defendant to be implied. In the instant case it is difficult to believe Congress would have wished to leave Erika, Inc. without a judicial remedy against the virtual spoliation revealed by the instant record, when such a remedy would have been unquestionable if Congress had just said nothing in its Social Security legislation about appeals and judicial review.

If a claimant can found a "colorable" claim on the Constitution, this may have an effect on the durability of an express consent to be sued against an implied withdrawal of it. *See Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). Acts of Congress relating to court jurisdiction and consent to be sued are to be construed in harmony with and not to thwart the purposes of the Constitution. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491, 51 S.Ct. 229, 232, 75 L.Ed. 473 (1931). *Cf. Atkins v. United States*, 214 Ct.Cl. 186, 556 F.2d 1028 (1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (concurring opinion). I would consider Erika's constitutional claims to be "colorable," not "insubstantial" or "frivolous," but it is not necessary to decide if they are valid. A claim to a construction of a statute or regulation, strongly influenced by constitutional considerations, also must fall in the category of colorable constitutional claims. At any rate, in my view, defendant quite possibly was attempting to defend an unconstitutional result on jurisdictional grounds.

We have learned not to characterize a fifth amendment taking by what the taker chooses to call it. If the United States interposes between a manufacturer or dealer and his customers, leaving him no alternative but to sell his product to the government on the government's terms, that is a taking. The contrary argument or defense here is that Erika, Inc. could refuse to do any business with the United States, sell its kidney dialysis material to patients for cash only, and leave the patients to collect the government benefits when entitled. Whether this is valid depends on economic factors we would need evidence to resolve that we do not have. A trial to obtain it is not necessary in the absence of indications that recovery on a fifth amendment theory would produce a larger award than what will ensure on the theory we espouse. Still, the constitutional theory is colorable, and being colorable, it aids our jurisdiction, which otherwise is probable but far from certain. The court therefore ought not to have given the theory the short shrift it has, and it should not have said Erika's participation in the program was "voluntary," which may be true and may be but a legal fiction. The voluntary nature of anyone's transactions with the government is not a simple matter to determine. Cf. *Sandnes' Sons, Inc. v. United States*, 199 Ct.Cl. 107, 462 F.2d 1388 (1972) where voluntariness was debated between majority and minority of this court sitting en banc.

Erika may have, probably has, made its constitutional allegations mostly to aid our jurisdiction, and we should not spurn this aid.