**Carmine FIORENTINO**

v.

**The UNITED STATES.**

**No. 390–77.**

United States Court of Claims.

Oct. 17, 1979.

Carmine Fiorentino, pro se.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. John Kosloske and Robert H. Moll, Washington, D.C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case presents novel and difficult issues despite superficial simplicity. We have held it after oral argument to await a decision in another court, plus supplemental briefing. It is now ripe for adjudication. It is a pay case before us on cross-motions for summary judgment. We hold for defendant and dismiss the petition.

Plaintiff, Carmine Fiorentino, was an attorney and a nonveteran. He was employed in the Department of Housing and Urban Development (HUD) in the "excepted" rather than the "competitive" service, being described as a "Schedule A" employee, as attorneys are generally. His normal duty station was Washington, D. C., but in 1972–73 he was serving a prolonged detail in an Elmira, New York Disaster Field Office. He was there charged with submitting false travel vouchers and improperly interfering with a police investigation of a theft of government property, falsely representing himself to be a U. S. Attorney. On October 3, 1973, a Federal Grand Jury indicted him on the false voucher charges. Trial occurred only on January 6, 1977, and resulted in acquittal under all counts. Meanwhile plaintiff was put under indefinite suspension, from December 1, 1973, followed by removal on August 2, 1974, the latter being based on the impersonation charge as well as the alleged false vouchers. Plaintiff was offered a hearing on the suspension, but declined it as it developed the only fact issue would be whether there had been an indictment, and whether continued service pending resolution of the indictment would be detrimental to the public interest. Plaintiff was denied any hearing on the removal on the ground that, being in an "excepted" position, he was not entitled to one.

The novelty of this case is that plaintiff does not base his claim on alleged procedural violations of applicable statutes and regulations, or lack of substantial evidence of his guilt. Rather, he says he has been deprived of both property and liberty without due process of law. In effect, though not in words, he admits that the statutes and regulations do not prohibit what was done in his regard, and only if the Constitution directly interposes in his behalf, can he prevail. Any other contention is too weakly urged to be noticed.

It has long been known around this "island" of Washington, and we may notice it under Federal Rules of Evidence

§ 201, that the Congress has been always opposed to Civil Service Commission (CSC) testing and examining of attorney positions in the Executive branch under the competitive system. The Commission has been equally unwilling to admit them to the "competitive" service without such testing. Defendant cites as the enacted expression of this the annual prohibition against appropriated funds of the CSC being used for the Commission's Legal Examining Unit. An unbroken series of such clauses runs from the Act of June 26, 1943, Pub.L.No. 90, 57 Stat. 169, 173, to the Act of October 10, 1978, Pub.L.No. 95–429, 92 Stat. 1001, 1007. The President had set up a Board of Legal Examiners (Legal Examining Unit), by E.O. 9358, July 1, 1943. By E.O. 9830, 12 Fed.Reg. 1259 (1947), the President in § 6.1 provided that positions in Schedule A and B should be excepted from the competitive service. Section 6.4 is Schedule A. Item IV therein is "attorneys." Whether the legislative intent is obvious to "outsiders," it certainly has been to the Executive branch, which has never, since May 1, 1947, put attorney positions anywhere but in the excepted service. The consequences of one's being in the "excepted" service (and not a veteran) are that one cannot put on the panoply of protection available to those in the "competitive" service when threatened by adverse action for cause. *Batchelor v. United States*, 169 Ct.Cl. 180, *cert. denied*, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965); *Chollar v. United States*, 126 F.Supp. 448, 130 Ct.Cl. 338 (1954). *Cf. Roth v. Brownell*, 215 F.2d 500 (D.C.Cir.), *cert. denied*, 348 U.S. 863, 75 S.Ct. 89, 99 L.Ed. 680 (1954) holding that some attorneys, including Roth, placed in the competitive service before the date of E.O. 9830, did not lose their protection by that order, but this does not avail our plaintiff. HUD Handbook 752.2, Appendix 1 states the general rule, whose existence plaintiff does not deny. The authority to prescribe exceptions to the rules governing the competitive service is given now in 5 U.S.C. § 3302(1) and E.O. 11315, 5 C.F.R. 1966–1970 Comp., 597. The schedule of excepted positions is now in 5 C.F.R. § 6.2. 5 C.F.R. § 213.3102(d) places attorneys in Schedule A. 5 C.F.R. § 752.103(a)(6) states that excepted employees do not enjoy any of the protections against adverse action which competitive service employees enjoy. The statutory protection of individuals in the competitive service is 5 U.S.C. § 7501, and of veterans §§ 7512 and 7701. Thus it would follow that nobody in an operating Executive agency could transfer incumbents of Schedule A positions (attorneys) from the excepted to the competitive service other than by authorization that does not appear to exist.

Plaintiff claims he has or had a constitutionally protected interest in his job, both of a property and liberty nature, which entitled him to a due process hearing. We take them up in that order.

As expounded in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), an incumbent's property interest in his job must be more than an "abstract need or desire" for it, or a "unilateral expectation." He must "have a legitimate claim of entitlement to it." Those cases do not deal with Federal employees, but in *Arnett v. Kennedy*, 416 U.S. 134, 151, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) they are cited as in point respecting procedural rights guaranteed by the Constitution to such employees. Since our plaintiff cannot rely on statutes or regulations or written contracts as the source of his "legitimate claim," we believe he is remitted to implied agreements or what *Perry v. Sindermann*, 408 U.S. at 602, 92 S.Ct. 2694 calls "unwritten common law." *See also Colm v. Vance*, 186 U.S.App.D.C. 132, 138, 567 F.2d 1125, 1131 (D.C. Cir. 1977) which, as to a Department of State employee, refers to "agency fostered policies or understandings" and "Department of State law."

The source of this plaintiff's "legitimate claim of entitlement," the sole source to all intents, was not known to him until after he filed this lawsuit. Defendant's counsel with admirable candor disclosed it to him. It is a HUD Handbook 302.2 entitled "*Ten-*

ure of Attorneys." (Hereinafter HUD 302.-2.) It refers to attorneys as the largest group of permanent employees who are under "the Schedule A authority of the excepted service." It purports to "establish a departmental policy on the acquisition of permanent tenure by attorneys." It tells how an attorney can by length of service acquire "permanent tenure." It is not disputed that plaintiff's length of service was sufficient. If an expectation of "permanent tenure" can be the basis of a "legitimate claim of entitlement" under the *Roth* standard, Mr. Fiorentino or any other HUD attorney might well have believed that he had such a claim.

The defendant, however, argues that "tenure" is a term of art in Federal personnel law. The CSC has defined it as follows:

Tenure means the period of time an employee may reasonably expect to serve under his current appointment. It is granted and governed by the type of appointment under which an employee is currently serving without regard to whether he has a competitive status or whether his appointment is in a competitive position or in an excepted position. [5 C.F.R. § 210.102(b)17]

This regulation treats as irrelevant to "tenure" whether one has a competitive or an excepted position, although one in the latter is subject to being cut off at any time, whereas in ordinary speech the meaning of "tenure" is such that the incumbent of an excepted position would certainly not have it. Defendant produces affidavits by the author of the handbook and by the head of his division. Both aver that the sole purpose of HUD 302.2 was to prescribe how attorneys should be grouped in instances of Reductions in Force (RIF). There was no intent to impart to excepted positions some or all of the available panoply of protections applicable to positions in the competitive service. Thus the real question is whether the word "tenure" should be construed as one skilled in Federalese would use it, or as it would be understood in ordinary speech. The public has undoubtedly heard of the word most often in connection with disputes in the academic community such as *Roth*

and *Perry v. Sindermann* dealt with. Defendant quotes some definitions that indicate that a professor with tenure will not be dismissed "without adequate cause" and "full academic due process" unless in a case of financial stringency (corresponding to the Federal RIF) or superannuation. It is clear there is a pretty close correspondence between the substantive rights of a professor with tenure, and a U. S. civil servant in the competitive service, faced in either case with a threatened dismissal for alleged misconduct. The details of the "due process" to be accorded may vary according to the rituals that might be favored in the two universes, but in essence, plaintiff is asserting that HUD 302.2, by saying he had tenure, effectively nullified the various decisions, Congressional, Executive, and other, that operated to place him in the excepted instead of the competitive service.

We find nothing in the Supreme Court or D. C. Circuit decisions to suggest that the postulated "common law" or "agency fostered policies and understandings" could override in this context the limitations of express statutes or regulations having the force of statutes, though they would not do so in any other context. We do not think any such holding was intended.

Defendant argues the matter with force and learning, but we think there is a shorter way to defendant's conclusion. It is that if the author of the handbook, and his superiors had each intended in effect to remove Mr. Fiorentino and all other HUD lawyers from the excepted service and to place them in the competitive, nullifying the laws involved, they would have intended something they had no authority to do. It would appear that to do what plaintiff says they did, they would have needed authority perhaps from Congress, certainly from the CSC. And the law is that the U. S. Government is not bound by pronouncements purportedly made in its behalf by persons not having actual authority. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Dunphy v. United States*, 208 Ct.Cl. 986 (1975) and

cases cited at 989; *Montilla v. United States*, 457 F.2d 978, 198 Ct.Cl. 48 (1972). In *Sims v. Fox*, 505 F.2d 857 (5th Cir. 1974) the court at 861, dealing with a "property" claim by an Air Force officer to his commission, points out the impossibility of the Air Force making any regulation or contract to create such a right, if contrary to the statutes that governed the Service. If the government were not involved a case of apparent authority might be urged, but with claims against the government, the decisions agree authority must be actual. Plaintiff does not and cannot show that the author of HUD 302.2 and his HUD superiors had any authority to nullify the placement of lawyers in the excepted service. Since the document, by itself, is subject to two interpretations, we choose to give it its meaning in Federalese, evidently intended, under which its only impact is on the treatment of the involved lawyers in case of a RIF, and thus its validity is sustained.

█ It is unfortunately all too common for government manuals, handbooks, and in-house publications to contain statements that were not meant or are not wholly reliable. If they go counter to governing statutes and regulations of the highest or higher dignity, *e. g.*, regulations published in the Federal Register, they do not bind the government, and persons relying on them do so at their peril. *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043, 218 Ct.Cl. —— (1978) (*A Handbook for Exporters*, a Treasury publication). *Dunphy v. United States, supra* (Navy publication entitled *All Hands*). In such cases it is necessary to examine any informal publication to see if it was really written to fasten legal consequences on the government. *Dunphy, supra. See also Donovan v. United States*, 433 F.2d 522 (D.C.Cir.), *cert. denied*, 401 U.S. 944, 91 S.Ct. 955, 28 L.Ed.2d 225 (1971) (*Employees Performance Improvement Handbook*, an FAA publication) (merely advisory and directory publications do not have mandatory consequences). The difficulty of deciding when a "Manual" is a "Regulation" is discussed, but not resolved in *Piccone v. United States*, 407 F.2d 866, 876, 186 Ct.Cl. 752, 770 (1969) (concurring

opinion). The D. C. Circuit has recently grappled with a similar problem in the context we have here. In *Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182, 562 F.2d 701 (D.C. Cir. 1977) the plaintiff claimed a "property" interest in his government job by reason of various statements in a Personnel Manual which he added up to a commitment not to terminate his service except for cause, including language such as the following:

> * * * Termination will be considered only after the officer fails to respond to positive efforts to provide him with an opportunity to demonstrate his capabilities. [PHS Personnel Manual, Sec. C(2).]

The majority deals with this in a footnote, No. 23, 183 U.S.App.D.C. at 190–191, 562 F.2d at 709–10, as it goes off on other grounds, but the footnote is apparently meant to answer a dissent by then Chief Judge Bazelon supporting the existence of a "property" interest. The note touches, as we do, on the absence of authority to make a commitment, if one had been intended.

*Ring v. Schlesinger*, 164 U.S.App.D.C. 19, 502 F.2d 479 (D.C. Cir. 1974) is an earlier decision of the same court. It treats a *Navy Personnel Manual* as the source of a probationary employee's "property" expectations, but no question was raised of the manual being ambiguous, containing blunders, or being unauthorized.

█ It follows that HUD 302.2 was a blundering or unauthorized manual and does not furnish an objective entitlement, under the *Roth* standard, that might enable us to hold that plaintiff had a property right in his HUD job. We are aware, however, that in *Paige v. Harris*, 584 F.2d 178 (1978) the Seventh Circuit has held that another HUD lawyer had such a property interest in his job, deriving his entitlement from HUD 302.2. We do not follow this decision and think it is in conflict with the authority we have cited. We think the circuit perhaps failed to take into account the degree of authority required before a spokesman can commit the U. S. Government to an entitlement as illustrated by the

*Merrill* case. Its analysis would be more appropriate for a state or private employer. We think it probably did not have the benefit of the information we have, as to the meaning of "tenure" in Federalese, and the specific intentions of the author of HUD 302.2 and his supervisor. It allows a mere blunder in language to commit the agency to a result no one in the agency had authority to achieve. If it is right, an easy way to nullify a uniform Congressional and Presidential policy over 30 years old is presented to every penpusher on the Federal payroll.

■ Now we turn to plaintiff's "liberty" interest. According to the *Roth* formula, 408 U.S. at 573, 92 S.Ct. 2694, this is implicated when the employer puts a person's good name, reputation, honor, or integrity at stake. It appears that a person terminable at will could demand a due process hearing if the employer who need allege any or no reason insists on alleging one that is defamatory in the above respects. Defendant urges that the public would only have access to the information that plaintiff had been fired for "misconduct," but plaintiff urges with considerable plausibility that a prospective employer who knew this much would certainly not hire plaintiff without knowing all.

■ Defendant urges that we lack jurisdiction because plaintiff does not have a money claim (*United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). The suit is founded on the Constitution and the Constitution requires only that a person with a liberty interest in plaintiff's position be given a chance to clear his name, not reinstatement or back pay, which are intrinsically inappropriate. We agree with hesitation, but in this area as in all others, the Constitution requires and will require what the Justices say it requires, etc., so an argument is more persuasive with support of case authority. Defendant tries to extract its point out of *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The Court does there say that in a "liberty" context the purpose of notice and hearing to a discharged employee not having a property interest is to give him an opportunity to clear his name and does not include reinstatement. This case is cited and followed in *Patterson v. Ramsey*, 552 F.2d 117 (4th Cir. 1977). The court expressly holds that in the absence of a property interest, due process requires a hearing only to clear the employee's name and not on the question of reinstatement. *See also Austin v. Board of Education of Georgetown*, 562 F.2d 446 (7th Cir. 1977), another of *Codd's* progeny. It is not much of a step to say if reinstatement is not a constitutional issue, back pay is not one either, but step it is.

■ Whatever the remedies of the liberty-oriented claimant may be in other courts, we think that as to the jurisdiction of this court, defendant alleges another and completely persuasive reason why it is withdrawn. If the consent to be sued here ever included the back pay claim of one having no property interest in his job, and legally aggrieved solely because of derogatory material in government files generated by his firing, we think that consent is withdrawn by the Privacy Act of 1974, 5 U.S.C. § 552a. It provides an administrative remedy for one so aggrieved, and if he is unsuccessful with that, he can sue in the U. S. District Court, including a suit for correction of his record. 5 U.S.C. § 552a(g)(1).

■ In *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Court held that previous debatable judicial remedies against the United States for racial discrimination in employment, including the Tucker Act, were all repealed by implication by the Equal Employment Act of 1972. The question of sovereign immunity entered strongly into this and justified a difference from the case of discrimination by a private employer. The instances of partial repeal of the Tucker Act by laws expressly directing litigation of some class or kind elsewhere are common. A recent example is 42 U.S.C. § 1395*oo*(f) which repeals by implication whatever consent previously existed to Tucker Acts suits by Social Security Act health care providers for expense reimbursement. *See Whitecliff, Inc. v. United States*, 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied*, 430 U.S. 969 (1977); *John Muir*

*Memorial Hospital v. United States*, Ct.Cl. No. 555–78 (Order of August 17, 1979). It might be supposed that this repeal by implication would not be so easy to find when a class or kind of suit was a well known and major part of Court of Claims jurisprudence, and free of the kind of doubt that existed about Civil Rights suits. However, in *Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932), the Suits in Admiralty Act of 1920 was held to withdraw by implication the portion of the Tucker Act which consented to Admiralty suits against the United States, although suits of this kind had been common in Court of Claims jurisprudence and clearly consented to. It appears that the rule of strict construction of the consent to be sued overrides the rule that repeals by implication are disfavored.

*Churchwell v. United States*, 545 F.2d 59 (8th Cir. 1976) is not in conflict with this analysis. Plaintiff, suing for injunctive relief, was a registered nurse accused of mishandling narcotics. She could claim no "property" interest in her job because of her probationary status. The government argued that the Privacy Act provided an administrative remedy she should have exhausted before suing, but the court held the contrary. No question of the Privacy Act diminishing jurisdiction by *Brown v. GSA* analysis was considered. The source of jurisdiction is not stated, but it could not have been the Tucker Act from which we would derive whatever jurisdiction we have, and which is peculiarly vulnerable to partial repeal by implication, as we have shown.

■ It is difficult to see why the Constitution should require an award of back pay to a former jobholder who has no property interest in his job, whose only grievance is that he is maligned in government files, and denied due process to correct it. No case has been cited to us that the Constitution does so require. *Churchwell*, found by the court, possibly so holds. The Privacy Act provides the due process and allows a remedy precisely tailored to the constitutional wrong. Where without it judicial boldness in dealing with the problem might be called for, with it such boldness would reflect an excessively meddlesome judicial attitude. Accordingly, we hold that Congress does not at present maintain a statutory consent to suit in this court by a former employee, removable at will, who asserts a "liberty" interest only by reason of derogatory material in his government file created in connection with his removal, and who, as relief for that action, would be entitled only to elimination of that material, not reinstatement or back pay.

Accordingly, the defendant's motion for summary judgment is granted and the plaintiff's cross-motion for summary judgment is denied. The petition is dismissed.