638 F.2d 486
 Michael M. BADEN, M.D., Plaintiff-Appellee,
v.
Edward I. KOCH, individually, and as Mayor of the City of
New York; S. Michael Nadel, as Director of the Department of
Personnel of the City of New York; Elliot M. Gross, M.D.;
and The City of New York, Defendants-Appellants.
 No. 317, Docket 80-7510.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 15, 1980.
Decided Dec. 17, 1980.
Rehearing and Rehearing En Banc Denied Feb. 9, 1981.
 
 Doron Gopstein, Office of the Corp. Counsel for the City of New York, New York City (Allen G. Schwartz, Corp. Counsel for the City of New York, Richard N. Bowers, Ellen August, David Drueding, Asst. Corp. Counsels for the City of New York, New York City, of counsel), for appellants Koch, Nadel and City of New York.
 Howard M. Squadron, New York City (Ira Lee Sorkin, Eugenie C. Gavenchak, Squadron, Ellenoff, Plesent & Lehrer, New York City, of counsel), for appellant Gross.
 Murray A. Gordon, New York City (Ronald H. Shechtman, Kenneth E. Gordon, Richard Imbrogno, Gordon & Shechtman, P. C., New York City, of counsel), for appellee.
 Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Southern District of New York, Haight, J., which declared that the removal by Mayor Edward Koch of the plaintiff, Dr. Michael M. Baden, from his position as Chief Medical Examiner (CME) of the City of New York without a hearing was void and ordered his reinstatement with back pay and enjoined Dr. Elliot Gross from serving as Baden's successor. Execution of the order was stayed pending appeal.
 
 
 2
 Baden, who had been a Deputy Chief Medical Examiner since 1972, was appointed CME by Mayor Koch effective August 1, 1978 based upon results of a competitive examination.[1] On July 13, 1979, Koch told Baden that he had conducted inquiries as to whether Baden should be removed from office before the end of his one-year probationary term. The Mayor told him that he had received adverse written reports from the City Commissioner of the Department of Health, Dr. Reinaldo A. Ferrer, and the District Attorney of New York County, Robert M. Morgenthau,[2] and favorable written reports from the District Attorneys of Queens, Bronx, and Kings Counties. Baden wrote a detailed, vigorous refutation of the complaints against him. Nevertheless, on July 30, Mayor Koch removed Baden as CME. In a memorandum delivered to Baden that same day, he stated the procedures used and the reasons for Baden's removal:
 
 
 3
 Since your one year probation period as Chief Medical Examiner will conclude on July 31, 1979, I have requested of various government officials their opinions concerning your performance in office. I have carefully reviewed Commissioner Ferrer's memorandum of July 13, 1979 and District Attorney Morgenthau's letter of July 12, 1979, copies of which were furnished to you at our meeting of July 13, 1979, as well as your replies of July 19th and July 20th respectively. In addition, I have considered the letters from the other District Attorneys and Mr. Morgenthau's response of July 30th to your letter of July 20th.
 
 
 4
 After review and consideration of the matter, I have decided to remove you as the Chief Medical Examiner for the reasons stated in Dr. Ferrer's memorandum and Mr. Morgenthau's letters. This letter confirms my decision which I communicated to you at our meeting of July 30th.
 
 
 5
 In accord with the procedures set forth in Section 557(a) of the City Charter, I am causing this letter, together with the letters referred to in this letter, to be served upon you and filed in the office of the Director of Personnel. Should you desire, I will withhold public comment upon this matter or dissemination of this memorandum pending your making a public explanation of the matters which are contained in the memorandum and letters referred to above until 3:00 PM July 31, 1979.
 
 
 6
 Following his removal as CME, Baden resumed his post as Deputy CME, but reserved his legal rights to contest his removal. He demanded a hearing to refute the complaints against him and, when he was rebuffed, he instituted this action on August 19, 1979, naming as defendants Koch, Dr. Elliot M. Gross, who had been appointed to succeed Baden as CME, S. Michael Nadel, Director of the Department of Personnel of the City of New York, and the City of New York. Baden asserted these five claims:
 
 
 7
 1. Koch stigmatized him by removing him on the basis of false charges, without affording him the opportunity for a hearing.
 
 
 8
 2. His removal from his classified civil service position was arbitrary and unreasonable, in that the asserted reasons were untrue and malicious.
 
 
 9
 3. At the time of his removal, he had acquired permanent civil service tenure in the position of Chief Medical Examiner, so that he could not be removed without a hearing.
 
 
 10
 4. His removal, and the appointment of Gross as his successor, violated the New York State Constitution and pertinent rules and regulations.
 
 
 11
 5. He was removed from his position because of the exercise, by him and members of his family, of their right of free speech.
 
 
 12
 Baden asked for a declaration that his removal was unlawful under federal and state law; restoration to the position of Chief Medical Examiner; the removal of Gross as Chief Medical Examiner; and the award of back pay, front pay, additional compensatory damages, costs and attorneys' fees. Baden's complaint asserted federal claims under the First and Fourteenth Amendments to the United States Constitution, and state claims under the New York State Constitution and applicable statutes and regulations. Subject matter jurisdiction was alleged on the basis of 42 U.S.C. § 1983 and its jurisdictional implementations, 28 U.S.C. §§ 1343(3) and 1343(4); 28 U.S.C. § 1331(a) and the Fourteenth Amendment; and 28 U.S.C. § 2201. The state law claims were asserted on the basis of pendent jurisdiction.
 
 
 13
 The district court granted Baden's motion for partial summary judgment, declaring illegal his removal from the office of CME, and denied defendants' motion for summary judgment. The court also granted Baden's motion for partial summary judgment on his liberty interest claim, that is, his claim of injury from public charges stigmatizing his professional name and reputation, and ordered a hearing to determine damages, if any. The portion of the order dealing with this damage claim is non-final and, therefore, not appealable. The denial of defendants' motion for summary judgment is also not appealable. Clark v. Kraftco Corporation, 447 F.2d 933 (2d Cir. 1971). Those parts of the order granting Baden reinstatement and enjoining Gross from serving as CME are final and reviewable under 28 U.S.C. § 1292(a)(1) (1980). The district court based its order reinstating Baden with back pay solely upon the third claim that he was removed without "the opportunity for a hearing to which he was entitled under state law, policy and practice."
 
 
 14
 We disagree with the position of the district court that Baden was entitled to a hearing prior to removal. Our decision in no way passes upon the truth or falsity of the complaints against Dr. Baden or upon the wisdom of his removal from office. Our sole concern is whether state law or mutual understandings gave Baden a right to a hearing before he could be removed from his post as CME.
 
 
 15
 Apparently, prior to this litigation it was assumed that a CME who had completed his probationary period could be removed only for cause following a hearing.[3] Mayor Koch's statements at the time indicate that he acted before August 1, 1979, the date he believed Baden's probation ended, to avoid having to give Baden a full hearing. The Mayor's July 30 memorandum to Baden, see p. 487, itself states that his review of Baden's performance was prompted by the mayor's belief that Baden's probationary term would end the next day. Presumably, the Mayor thought it would be easier to remove Baden before his probationary term ended:
 
 
 16
 "You must understand that this would have been a permanent appointment," the Mayor said, "a lifetime appointment."...
 
 
 17
 "A year from now, we might learn that the (charges of poor judgment were) right and then it would be too late," Mr. Koch said.
 
 
 18
 N. Y. Times, Aug. 3, 1979, at B1, col. 1. The confusion probably arose because prior to 1978 the standard probationary term was six months. Mayor Koch signed the order establishing one-year probationary terms on July 27, 1978, five days before Baden's appointment, but it did not become effective until approved by the State Civil Service Commission on October 20, 1980. Therefore, the district court concluded that Baden had only a six-month probationary term which had expired long before July 31, 1980, the day Baden was removed as CME. Our analysis of New York law and federal procedural due process leads us to conclude, however, that the mutual understandings, or perhaps more accurately, misunderstandings as to procedures for removing a CME, cannot alter the clear provision of New York law that no hearing is required before removing him. Having examined the language and history of the relevant statutes, we conclude that the New York State Legislature intended that a Chief Medical Examiner, even after the expiration of his probationary period, can be removed without a prior hearing regardless of any mutual understandings to the contrary. Therefore, we vacate the district court order insofar as it reinstates Dr. Baden with back pay and enjoins the continuation of Dr. Gross in his position as CME.
 
 Statutory Entitlement
 
 19
 Before Baden can establish a right to reinstatement, he must show that he has a property right recognized by the Constitution of the United States for purposes of procedural due process. This property right must come from either state law or, in its absence, from mutual understandings of the parties. As the Supreme Court explained in Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):
 
 
 20
 To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it ....
 
 
 21
 Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
 
 
 22
 In Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), the Supreme Court explicitly declared that "rules or mutually explicit understandings" may support the claim of entitlement.
 
 
 23
 The existence under state law of Baden's property interest in his post as CME hinges upon how § 557(a) of the New York City Charter can be reconciled with N. Y. Civil Service Law § 75(1)(a). Section 557(a), which sets forth the specific provisions for the appointment and removal of the Chief Medical Examiner of the City of New York, provides in its entirety:
 
 
 24
 There shall be in the department an independent office of chief medical examiner, the head of which shall be the chief medical examiner, who shall be appointed by the mayor from the classified civil service and be a doctor of medicine and a skilled pathologist and microscopist. The mayor may remove the chief medical examiner upon filing in the office of the personnel director and serving upon the chief medical examiner in his reasons therefor and allowing such officer an opportunity of making a public explanation.
 
 
 25
 This provision is based upon a 1915 law of the New York State Legislature amending the Charter of the City of New York, 1915 N.Y.Laws, Ch. 284 (McKinney).[4] Some technical and organizational changes have been made in various reenactments[5] but the procedures for removal have remained the same: (1) the mayor serves on the CME the reasons for his action; (2) the mayor files the reasons with the office of the director of personnel; and (3) the mayor allows the CME an opportunity of making a public explanation. Therefore, on its face § 557(a) appears to set forth all the procedures required under state law to remove a CME. There is no dispute that Mayor Koch complied with the provisions of § 557(a).
 
 
 26
 Nevertheless, Baden argues that the legislature also intended the CME to receive the full protection of N.Y.Civil Service Law § 75(1)(a) (McKinney 1980), which forbids dismissal "except for incompetency or misconduct shown after a hearing upon stated charges." The protection of § 75(1)(a), according to Baden, applies to any person who, like the CME, holds "a position by permanent appointment in the competitive class."[6] Baden argues that, when the predecessor of § 557(a) was passed in 1915, the legislature intended the CME to receive the full protection afforded other civil servants and that, therefore, the establishment in 1955 of the § 75(1)(a) pretermination hearing for all civil servants[7] encompassed the CME. Baden buttresses this statutory interpretation with prelitigation statements showing a widespread belief that the CME could only be removed following a hearing.[8] Despite the plausibility of Baden's arguments, we reject his statutory interpretation based upon our examination of the legislative history.
 
 
 27
 The starting point for our analysis is New York Civil Service Law § 76(4) (McKinney 1980) which provides that
 
 
 28
 (n)othing contained in section seventy-five (e. g., the right to a pretermination hearing) ... shall be construed to repeal or modify any general, special or local law or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any civil division.
 
 
 29
 Section 557(a) is a "charter provision relating to the removal ... of officers or employees in the competitive class." Id. Although § 76(4) was enacted in 1941,[9] and the hearing rights of § 75(1)(a) were not granted until 1955, § 76(4) is nevertheless strongly persuasive that, when the legislature amended the general provisions of § 75(1)(a), it did not intend to expand the procedural rights of an office which, like CME, was covered by a specific charter provision.
 
 
 30
 The legislative history convinces us that the legislature did not intend the CME to have a pretermination hearing. In 1915 the legislature did not require a hearing before removal of the CME of the City of New York, even though thirteen years earlier the legislature had provided that the Erie County Medical Examiner could only be removed "for cause, stated in writing, after an opportunity to be heard in his defense," 1902 N.Y.Laws, Ch. 577, § 2 (McKinney). The legislature's failure to require a pretermination hearing cannot be viewed as an omission caused by ignorance of the role a pretermination hearing could play in protecting an official's independence from political pressure. Almost twenty years before the office of CME of the City of New York was created, Chief Judge Andrews stated:
 
 
 31
 There are many statutes on the statute book relating to the employment and removal of police officers, clerks and employees in municipalities, which expressly or by implication require that the power of removal shall only be for cause after notice and hearing of the person whose removal is contemplated. The practice of legislation in this state has been to insert a provision for notice and hearing when this has been intended.
 
 
 32
 People ex rel. Fonda v. Morton, 148 N.Y. 156, 164, 42 N.E. 538 (1896). The legislature's omission of a requirement for a pretermination hearing should be viewed as a deliberate legislative choice that a hearing was not an appropriate procedural requirement for removal of the CME. Such a choice was in keeping with the primary thrust of the reform legislation which was to replace elected, incompetent coroners selected for their political strength with appointed medical professionals selected for their scientific and administrative strengths.[10]
 
 
 33
 It is arguable that, because the 1915 legislature intended the CME to be independent of the mayor and politics, and because the 1955 legislature expanded hearing rights for New York civil servants in § 75(1)(a), those same rights should be read into § 557(a). This rationale does not square with the legislative intent as re-expressed by the New York Law Revision Commission in 1961. At that time the legislature directed the Commission
 
 
 34
 to make a thorough study and examination of all laws of this state relating to the offices of coroner and medical examiner ... (and) recommend such changes as may be deemed necessary to modify or eliminate antiquated or undesirable provisions of such laws and to bring the statutes relating to coroners and medical examiners into harmony with modern conditions.
 
 
 35
 1961 N.Y.Laws, Ch. 479 (McKinney). After this review was completed and even though several other laws respecting medical examiners were substantially modified, see 1962 N.Y.Laws, Ch. 897 and 1965 (N.Y.Laws, Ch. 545 (McKinney), no substantive changes were made in the removal provisions of § 557(a). Significantly, the new legislation establishing removal procedures for county medical examiners provided that "(t)he medical examiner shall serve at the pleasure of the board of supervisors and his appointment may be revoked at any time by resolution of the board of supervisors." 1962 N.Y.Laws, Ch. 897, § 1 codified at N.Y.County Law § 400(4-a) (McKinney 1972). The significance of the failure to change § 557(a), while making the county medical examiners serve "at the pleasure of the board of supervisors," is increased because 1965 N.Y.Laws, Ch. 545 n.* stated that its amendments had been recommended by the Law Revision Commission and that their purpose was to confer on county medical examiners "jurisdiction and authority to investigate unexplained deaths corresponding to the jurisdiction and authority exercised by the medical examiners of New York City and of certain counties under special acts of the Legislature." The Law Revision Commission presumably also reviewed the removal provisions for the CME of the City of New York before concluding that county medical examiners should only serve "at the pleasure of the board of supervisors." Therefore, we conclude that § 557(a) provides the exclusive procedural safeguards which the legislature believed to be appropriate for removal of the CME.[11]
 
 Mutual Understandings
 
 36
 The district court concluded that, although New York law did not grant Baden a hearing, the use in § 557(a) of the words "may remove (the CME)" indicated that the legislature intended to permit other removal provisions to be established by later mutual understandings. Using that theory, a right to a hearing could be established based upon the mutual understandings. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). However, the district court misinterpreted § 557(a). The phrase "may remove" is often used in the New York City Charter to indicate the only means by which an official may be removed, see, e. g., §§ 6, 9, 32, 554, 661, 662, 1171, 2301. Use of the phrase "shall remove" would be less appropriate because it would imply that the official must be removed. Whatever ambiguity may exist in the text is resolved by the legislative history examined above, which shows that § 557(a) was intended to provide the only procedures required for the removal of the CME.
 
 
 37
 Because the statute clearly permits removal of the CME without a prior hearing, Baden could be removed without a prior hearing regardless of any mutual understandings between the individuals involved in the transaction.[12] This case falls squarely within the cases of Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 (2d Cir. 1980), Stone v. Philbrook, 528 F.2d 1084 (2d Cir. 1975), and Fiorentino v. United States, 607 F.2d 963 (Ct.Cl.1979), cert. denied, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), in which it was held that mutual understandings and customs could not create a property interest for purposes of due process when they are contrary to the express provisions of regulations and statutes. As Judge Friendly wrote in Stone :
 
 
 38
 In Sindermann, the Court, in the absence of any tenure rules, was forced to look to the Odessa Junior College Official Faculty Guide, and the existing understandings, which, in such a vacuum, might have created a de facto tenure system ....
 
 
 39
 Since there are explicit state regulations in the present case, it would seem that, if these regulations comport with the state statute, any claim of further entitlement could hardly be sustained.
 
 
 40
 528 F.2d at 1990-91. In Fiorentino the Court argued that:
 
 
 41
 We find nothing in the Supreme Court or D. C. Circuit decisions to suggest that the postulated "common law" or "agency fostered policies and understandings" could override in this (federal employment) context the limitations of express statutes or regulations having the force of statutes ....
 
 
 42
 It is unfortunately all too common for government manuals, handbooks, and in-house publications to contain statements that were not meant or are not wholly reliable. If they go counter to governing statutes and regulations of the highest or higher dignity, e. g., regulations published in the Federal Register, they do not bind the government, and persons relying on them do so at their peril.
 
 
 43
 607 F.2d at 967-68.
 
 
 44
 Quinn was factually similar to the instant case. Quinn, who had been removed from his job without a hearing, alleged
 
 
 45
 that the Staff Handbook (like the City of New York Official Directory here), together with (his supervisor's) assurances on behalf of the SMNC Board, gave rise to a mutual expectation of continued employment analogous to that enjoyed by the probationary teacher in Perry, supra. But Perry recognized that if state law had previously provided that "no contractual or other claim to job tenure" existed, the teacher would have enjoyed no protected property interest. 408 U.S. at 602 n.7, 92 S.Ct. at 2700. If the state has not attempted to wrest a governmental benefit from an individual claimant through definitional gamesmanship, and state law clearly rejects any inference of legitimate entitlement, a mutual understanding not grounded in state law is of no consequence.
 
 
 46
 613 F.2d at 448. We hold that Baden is not entitled to a hearing because "state law clearly rejects any inference of legitimate entitlement," id.[13]
 
 
 47
 We reverse the district court's holding that Baden's removal as CME was illegal and vacate its order insofar as it requires the reinstatement of Baden with back pay and enjoins the continuation of Dr. Gross in his position as CME, and remand to the district court for further proceedings not inconsistent with this opinion.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 48
 I respectfully dissent. In my view Dr. Baden, having completed his six-month probationary term as a person appointed to a non-political, non-policy-making position in the competitive class of the classified civil service (i. e., as County Medical Examiner (CME)), acquired permanent tenure under New York's Civil Service laws and a property entitlement to that position. New York State Civil Service Law § 75(1)(a) expressly provides that "(a) person holding a position by permanent appointment in the competitive class of the classified civil service," which describes Dr. Baden's post as CME, "shall not be removed or otherwise subjected to any disciplinary penalty ... except for incompetency or misconduct shown after a hearing upon stated charges." Once Dr. Baden acquired permanent tenure, as he did by serving six months in the position of CME, his status was quite different from that of non-civil service city employees who did not acquire their positions by virtue of competitive examination but were appointed in a political context as part of the Mayor's policy-making executive staff.
 
 
 49
 The record is clear that both the City of New York and Baden proceeded from the outset on the basis that Baden would acquire permanent tenure after expiration of his period of probation. The City's notice of the civil service examination for the position of CME described it as a position in the competitive civil service, explicitly incorporating the City's General Examination Regulations which, like the City's Civil Service Rules, provided that persons appointed to positions in the competitive civil service would undergo a six-month probationary period (later changed prospectively to one year, but after Dr. Baden had been hired). The obvious purpose of the notice was to assure the successful civil service competitor that he would be removable at will only during the six-month probationary period, after which, having gained permanent tenure, he would be removable only for cause after a public hearing. Otherwise the whole civil service examination procedure would amount to nothing more than a meaningless charade.
 
 
 50
 The Mayor of the City of New York so construed the applicable laws. Although he labored under the erroneous impression that Dr. Baden was on probation for one year rather than the already-expired six-month period, the important point for present purposes is that the Mayor sought to exercise his rights under § 557(a) of the City Charter, which permits removal of a CME who has not gained a permanent tenure, before the expiration of what the Mayor conceived to be the probationary period, stating, "You must understand that (after expiration of the probationary period) this would have been a permanent appointment ... a lifetime appointment .... A year from now we might learn that (Health Commissioner Ferrer and District Attorney Morgenthau were) right and then it would be too late." N. Y. Times, Aug. 3, 1978, Section B, p. 1, col. 1.
 
 
 51
 The Official Directory of the City of New York, published under the Mayor's imprimatur, expressly stated that Chief Medical Examiner Michael M. Baden had been "appointed from the Classified Civil Service," had "Permanent tenure," and was "Removable by the Mayor only on stated charges after a hearing." Nevertheless the majority here holds that he was removable at will without a hearing.
 
 
 52
 None of the reasons proffered by the majority in support of its holding are sustainable. First, it is asserted that N.Y.Civil Serv.Law, § 75(1)(a), which prohibits removal of permanent civil service employees except for cause and after a hearing, conflicts with § 557(a) of the City Charter, which authorizes removal of the CME at will. However, when these two laws are construed in pari materia, as they must be under N.Y.Statutes (McKinney), §§ 221(b) and 222, see Coster v. Albany, 43 N.Y. 399 (1870), no such inconsistency appears. As the Mayor recognized in his attempt to "beat the clock" by removing Baden at will before he acquired permanency, § 557(a) of the City Charter applies before the civil service employee acquires permanent status. Thereafter, § 75(1)(a) becomes operative and § 557(a), having served its purpose, no longer operates. The statute and the City Charter provision are therefore consistent with one another and dovetail, rendering inapplicable N.Y.Civil Service Law, § 76(4) (McKinney 1980), which requires that nothing in § 75 shall be construed to repeal or modify a charter provision. Section 75(1)(a) does not repeal or modify § 557(a) of the City Charter. They apply to different time periods.
 
 
 53
 The second basis of the majority's decision is equally unpersuasive. The majority argues that the New York Legislature's adoption in 1962 of a law to the effect that the board of supervisors of a county shall appoint a medical examiner who shall serve at the pleasure of the board, 1962 N.Y.Laws, Ch. 897, N.Y.County Law § 400(4-a) (McKinney 1962), is consistent with the majority's interpretation of § 557(a) of the City Charter as authorizing removal at will after the CME has acquired permanent tenure. At the outset the argument is met by the admitted inapplicability of N.Y.County Law, § 400(4-a), to the CME of New York City. Moreover, § 10 of L.1962, ch. 897, provides, in keeping with the legislature's desire to permit counties to be free to regulate the employment of their own CMEs, that any county charter provision in conflict with the 1962 amendment (4-a) will apply. Here the City Charter, § 816, differs from § 400(4-a) by requiring that all appointments of persons such as CMEs be made "in accordance with the provisions of the civil service law." If the office of CME were not governed by the New York Civil Service Law, including § 75(1), it might then be treated as analogous to appointments made under N.Y.County Law, § 400(4-a), under which there is no mandate that medical examiners be appointed as part of the competitive civil service class, and the appointee might then be removed at will by the appointing power (the board of supervisors). But New York City has chosen to make the post of CME a civil service position and § 75(1) therefore applies.
 
 
 54
 As a last, fall-back, position the majority suggests that Dr. Baden should be treated as coming within the "independent officer" exception to New York's Civil Service Law, i. e., as a civil servant possessing such a high degree of initiative and independent judgment that he should not be entitled to the protections of § 75(1)(a). See Nolan v. Tully, 52 A.D.2d 295, 383 N.Y.S.2d 655 (3d Dept. 1976); Eaton v. County of Broome, 73 A.D.2d 991, 423 N.Y.S.2d 1021 (3d Dept. 1980). There are several reasons for not expanding this narrow judicially-created exception of the Third Department to the present case. In the first place it would, if applied here, tend to defeat the purpose of New York's Civil Service Law, which is to insure that hiring decisions, particularly where founded on competitive examination, should be based on merit rather than on politics. Second, while the CME's duties are important in that he has the power to appoint and remove members of his own staff, subject to civil service law limitations, and to investigate causes of death, they are not political or policy-making in nature. Thirdly, Nolan and Eaton are distinguishable in significant respects from the present case. Nolan was concerned with a non-competitive class of estate tax attorneys possessing a wide range of discretionary powers. In Eaton the position, Business Manager of the Broome County Infirmary, had as a de facto matter been upgraded to that of a department head (Nursing Home Administrator) and within one month after the incumbent's dismissal was reclassified from a competitive civil service position to that of an exempt one. Local legislation, moreover, then specified that the holder was "to serve at the pleasure of the county Executive" and the Broome County charter, § 2604, placed department heads in the unclassified service. In contrast to cases where the narrow independent officer exception was applied, we are here confronted with a situation where everyone viewed the position of CME to be non-political and non-policy making in nature.
 
 
 55
 Nor is the situation here governed by our decisions in Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 (2d Cir. 1980), and Stone v. Philbrook, 528 F.2d 1084 (2d Cir. 1975), which held that a property interest in a position for due process purposes cannot be created on the basis of mutual understandings or expectations of the parties which are contrary to express statutory limitations. Here the parties' expectations and understandings, as reflected in (1) the Mayor's reasonable interpretation of the relevant statutes (undoubtedly after consultation with the City's Corporation Counsel), and (2) the City's Official Directory, (3) Dr. Baden's understanding that he would acquire permanent status after his six-month probationary period, and (4) the recognized purpose of the pertinent civil service laws, simply confirmed what those laws provided and were not in conflict with them. Under these circumstances the reasonable expectations and understandings of the parties recognized a due process property right in the position which could not constitutionally be defeated by denying Dr. Baden his right under N.Y.Civil Service Law § 75(1)(a) not to be removed except for incompetence or misconduct after a due process hearing. Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 600-03, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).
 
 
 56
 Dr. Baden was clearly denied his right to a due process hearing. The adverse effect of the Mayor's decision to remove him was exacerbated by the abruptness with which the Mayor acted with respect to the holder of an essentially non-political position. The Mayor's undue speed, which was wholly unnecessary, deprived Dr. Baden of a fair opportunity to face his accusers.
 
 
 57
 For these reasons I would affirm the judgment of the district court.
 
 
 
 [1]
 The CME is in the competitive class of the New York Civil Service and, therefore, must be filled based upon the results of a competitive examination. N.Y.Civ.Serv.Law § 52(1) (McKinney 1980). Although placement in the "competitive class" triggers the protection of § 75(1)(a), designation of a position as being in the competitive class has no connection with what removal procedures may be most appropriate for that position. Rather, designation of a position as a being in the competitive class merely refers to whether it is feasible for the appointment to be made based upon a competitive exam. See N.Y.Civ.Serv.Law § 44 (McKinney 1980)
 
 
 [2]
 The contents of the adverse reports are of no concern to us since we do not rule on the justification for Baden's removal
 
 
 [3]
 "The City of New York Official Directory" since 1962 has stated that the CME has "(p)ermanent tenure. Removable by the Mayor only on stated charges after a hearing." See, e. g., the Official Directory for 1978, at 122. Some published writings also suggest a belief that the CME could only be removed for cause following a hearing. See, e. g., N. Y. Times, Jan. 31, 1918, § 1, at 6, col. 2 and id., April 14, 1972, § 1, at 41, col. 5. Appellants dispute the accuracy and reliability of Baden's sources and offer their own evidence as to prelitigation understandings respecting the CME, but in view of our disposition of the case there is no need to reach the issue of whether summary judgment on the issue of the existence of mutual understandings was proper
 
 
 [4]
 It was effective as § 1570 of the New York City Charter in 1918, and was substantially reenacted as § 874 of the 1938 Charter, § 1720(1) of the 1963 Charter, and § 557(a) of the 1975 Charter (as amended by N.Y.City L.L. 102, 1977)
 
 
 [5]
 E. g., "serving upon the chief medical officer" in § 1720(1) became "serving upon the chief medical examiner" in § 557
 
 
 [6]
 N.Y.Civ.Serv.Law § 75(1)(a) reads:
 
 
 [1]
 Removal and other disciplinary action. A person described in paragraph (a), or paragraph (b), or paragraph (c), or paragraph (d) of this subdivision shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section
 (a) A person holding a position by permanent appointment in the competitive class of the classified civil service ....
 
 
 [7]
 1955 N.Y.Laws, Ch. 596, § 1 (McKinney)
 
 
 [8]
 See pp. 488-89 and note 3 supra
 
 
 [9]
 1941 N.Y.Laws, Ch. 853 (McKinney)
 
 
 [10]
 A pathologist writing in 1913 urged "the abolishment of the anachronistic coroner's office and (the placement of) medical investigation in the hands of trained medical experts." Schultz, The Coroner's Office, 47 Annals 112
 Based upon a study by the Municipal Association of Cleveland of which he was chairman, Prof. Schultz concluded that "(b)ecause of improper medical qualifications, most coroner's autopsies are valueless, both for determining the cause of death in a scientific manner, and for furnishing the basis of expert testimony," id. at 118.
 
 
 [11]
 A New York State Appellate Division decision issued after the district court's decision strengthens the conclusion that the CME does not have § 75(1) (a) rights. In Eaton v. County of Broome, 73 A.D.2d 991, 423 N.Y.S.2d 1021 (3d Dep't 1980), the court affirmed the removal of a County Nursing Home Administrator, a competitive employee dismissed without a hearing, "on the opinion of Mr. Justice Zeller at Special Term." Justice Zeller extended the "independent officer" rule of New York Civil Service Law so that civil servants who exercise a high degree of initiative and independent judgment, even if they are competitive employees, are not entitled to the protections of § 75(1)(a) and may be removed without a hearing. The top post at the Medical Examiner's Office of the City of New York certainly demands as much initiative and judgment as the position of County Nursing Home Administrator. Even if the Eaton rule were inapplicable to the CME or is an inaccurate statement of New York law, it strengthens our conclusion that textual ambiguity and silence do not imply that the CME is protected by § 75(1)(a)
 
 
 [12]
 We are not persuaded that New York law would permit mutual understandings to thwart a removal procedure that was intended by the legislature to balance the competing considerations of creating political independence for the CME while maintaining his accountability. In Hauben v. Goldin, 74 A.D.2d 804, 426 N.Y.S.2d 273 (1st Dep't 1980), the court rejected an estoppel argument by a petitioner who had been requested by his supervisors, including the Administrator of the Parks, Recreation and Cultural Affairs Administration, to continue working on the assurance that a new title for his position would be created. The Appellate Division noted:
 While, by now, it is settled that under certain circumstances, in exceptional cases, equitable estoppel is applicable to units of local government (Brennan v. New York City Housing Auth., 72 A.D.2d 410, 424 N.Y.S.2d 687) the application of this doctrine against such local government should be made only when failure to do so would operate to defeat a right legally and rightfully obtained. It cannot operate to create a right. (Matter of McLaughlin v. Berle, 71 A.D.2d 707, 418 N.Y.S.2d 246; Gadzella v. Neumaier, 67 Misc.2d 585, 324 N.Y.S.2d 600.) Nor can it operate to relieve one from the mandatory operation of a statute, as here.
 
 
 [74]
 A.D.2d at 805, 426 N.Y.S.2d 273 (emphasis added). Similarly, in McLaughlin v. Berle, 71 A.D.2d 707, 418 N.Y.S.2d 246 (3d Dep't 1979), the court refused to impose estoppel upon a state agency which had dismissed an apparently tenured employee without a hearing after it was discovered that the employee's appointment was ultra vires
 
 
 [13]
 Cases which have recognized a property right based upon mutual understandings are distinguishable from the instant case because, as in Perry, the governing statutes and regulations were silent as to whether a property right could be created by mutual understandings. For example, in Ashton v. Civiletti, 613 F.2d 923 (D.C.Cir.1979), although the court recognized that no procedural rights against termination were given an FBI employee by statute, it concluded that "those facts do not prevent the Bureau from giving its employees some security in their jobs," id. at 928. There was no suggestion that the job security given employees by the FBI contravened a legislative determination of the maximum amount of job security permissible
 Paige v. Harris, 584 F.2d 178 (7th Cir. 1978), reached the opposite result from Fiorentino v. United States, 607 F.2d 963 (Ct.Cl. 1979) cert. denied, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), but the results diverged only because the courts differed in their interpretations of the employment laws and regulations governing federal attorneys. Fiorentino interpreted the laws and regulations to preclude additional procedural safeguards, whereas Paige interpreted the laws and regulations to permit additional procedural safeguards. Neither court argued that mutual understandings could create a property right contrary to a clear statutory provision.